[No. A120049. First Dist., Div. Two. Aug. 21, 2009.]

SEQUOIA PARK ASSOCIATES, Plaintiff and Appellant, v.
COUNTY OF SONOMA, Defendant and Respondent.

COUNSEL

Bien & Summers, Elliot L. Bien and Catherine Meulemans for Plaintiff and Appellant.

The Loftin Firm, L. Sue Loftin and Michael Stump for Rancho Sonoma Partners, Eden Gardens, Sundance Estates and Capistrano Shores as Amici Curiae on behalf of Plaintiff and Appellant.

Steven M. Woodside, County Counsel, Sue A. Gallagher and Debbie F. Latham, Deputy County Counsel, for Defendant and Respondent.

Aleshire & Wynder, William W. Wynder and Sunny K. Soltani for California State Association of Counties, League of California Cities, City of Carson and the City of Los Angeles as Amici Curiae on behalf of Defendant and Respondent.

OPINION

RICHMAN, J.—One of the subjects covered by the Subdivision Map Act (Gov. Code, § 66410 et seq.) is the conversion of a mobilehome park from a rental to a resident-ownership basis. One of the provisions on that subject is Government Code section 66427.5 (section 66427.5), which spells out certain steps that must be completed before the conversion application can be approved by the appropriate local body. Although it is not codified in the language of section 66427.5, the Legislature recorded its intent that by enacting section 66427.5 it was acting "to ensure that conversions . . . are bona fide resident conversions." (Stats. 2002, ch. 1143, § 2.)

The County of Sonoma (County) enacted an ordinance with the professed aim of "implementing" the state conversion statutes. It imposed additional

obligations upon a subdivider submitting a conversion application to those required by section 66427.5. The ordinance also imposed criteria that had to be satisfied by the subdivider before the application would be presumed bona fide and thus could be approved.

A mobilehome park operator brought suit to halt enforcement of the ordinance on the ground that it was preempted by section 66427.5. The trial court declined to issue a writ of mandate, concluding that the ordinance was not preempted. As will be shown, we conclude that the ordinance is expressly preempted because section 66427.5 states that the "scope of the hearing" for approval of the conversion application "shall be limited to the issue of compliance with this section." (*Id.*, subd. (e).) We further conclude that the ordinance is impliedly preempted because the Legislature, which has established a dominant role for the state in regulating mobilehomes, has indicated its intent to forestall local intrusion into the particular terrain of mobilehome conversions, declining to expand section 66427.5 in ways that would authorize local government to impose additional conditions or requirements for conversion approval. Moreover, the County's ordinance duplicates several features of state law, a redundancy that is an established litmus test for preemption. We therefore reverse the trial court's order and direct entry of a new order declaring the ordinance invalid.

## BACKGROUND

On May 15, 2007, the County's board of supervisors unanimously enacted ordinance No. 5725 (the Ordinance). Sequoia Park Associates (Sequoia) is a limited partnership that owns and operates a mobilehome park it desires to subdivide and convert from a rental to a resident-owner basis. Within a month of the enactment of the Ordinance, Sequoia sought to have it overturned as preempted by section 66427.5. Specifically, Sequoia combined a petition for a writ of mandate with causes of action for declaratory and injunctive relief, and damages for inverse condemnation of its property.

The matter of the Ordinance's validity was submitted on the basis of voluminous papers addressing Sequoia's motion for issuance of a writ of mandate. The court heard argument and filed a brief order denying Sequoia relief. The court concluded that section 66427.5 "largely does appear . . . by its own language" to impose limits on local authority to legislate on the subject of mobilehome conversions. "However, Ordinance 5725 seems merely to comply with, and give effect to, the requirements set forth in section 66427.5 rather than imposing additional requirements. This is certainly true for the language on bona fide conversions, tenant impact reports, and even

general plan requirements. It is possibly less clear regarding health and safety, but even on this issue, the Ordinance does not appear to exceed [the County's] authority since, contrary to [Sequoia's] contention, it does not intrude on the [state Department of Housing and Community Development's] power in the area." This order is the subject of Sequoia's appeal.[1]

## DISCUSSION

The parties agree that our review of the trial court's order is de novo because it involves a pure issue of law, namely, whether the Ordinance is preempted by section 66427.5. (*Apartment Assn. of Los Angeles County, Inc. v. City of Los Angeles* (2006) 136 Cal.App.4th 119, 132 [38 Cal.Rptr.3d 575]; *Roble Vista Associates v. Bacon* (2002) 97 Cal.App.4th 335, 339 [118 Cal.Rptr.2d 295].) But the parties do not agree on how far our analysis may, or should, extend.

Sequoia argues we should restrict our inquiry to the current version of section 66427.5, in particular paying no attention to an uncodified expression of the Legislature's intent passed at the same time that version was enacted. At the same time Sequoia also argues that we should look to a provision in a version of an amendment to the statute that the Legislature rejected in 2002.

The County's approach is similarly compressed: noting that because Sequoia challenged the legality of the Ordinance on its face, the County argues that our analysis must be confined to the four corners of that enactment, and nothing else. Yet the County ranges far afield in marshalling the statutes which it incorporates in its arguments, and tells us that section 66427.5 must be considered in the context of the "entire continuum of state regulation of mobilehome park subdivisions." And the County has no hesitation in arguing that the substance of the uncodified provision actually works to the County's benefit.

---

[1] It is typical of the generally high quality of the briefing that the experienced appellate counsel for Sequoia does not treat the requirement of California Rules of Court, rule 8.204(a)(2)—which directs that the appellant "explain why the order appealed from is appealable"—as satisfied with a ministerial recital of boilerplate language. He devotes more than two full pages of his opening brief to a discussion establishing that, according to *Bettencourt v. City and County of San Francisco* (2007) 146 Cal.App.4th 1090, 1097–1098 [53 Cal.Rptr.3d 402], "Although the [trial court's] order was couched as a denial of the mandate petition alone, its effect was a dismissal of Sequoia's entire action," and thus appealable as a final judgment. He also puts forward a fallback position, based on an obvious knowledge of this court, that, if necessary, we "could also amend the order below as this division did in similar circumstances in *Gatto v. County of Sonoma* (2002) 98 Cal.App.4th 744, 766, fn. 13 [120 Cal.Rptr.2d 550], to specify the trial court's intent to dispose of the remaining causes of action." We conclude there is no need to amend the order because counsel's initial explanation is sound, and concurred in by the County. We mention this to note that this is the sort of attention to jurisdictional issues we would like to see, but seldom do.

Our view of our inquiry is that it is hardly as narrow as the parties believe. The authorities cited by the County involve situations where local ordinances were challenged on federal constitutional grounds (e.g., *Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084 [40 Cal.Rptr.2d 402, 892 P.2d 1145] [vagueness]; *Sanchez v. City of Modesto* (2006) 145 Cal.App.4th 660, 679–680 [51 Cal.Rptr.3d 821] [equal protection]), not that they were preempted by state law. As for Sequoia's approach, it would appear feasible only if the state statute has language stating the unambiguous intent by the Legislature expressly forbidding cities and counties from acting.

■ But for the great number of preemption issues—particularly if the emphasis is on implied preemption—the state and the local legislation must be considered together. Only by looking at both can a court know if the local law conflicts with, contradicts, or is inimical to the state law. As will now be shown, this is an established rule of preemption analysis.

### Principles of Preemption

■ In California, preemption of local legislation by state law is a constitutional principle. "A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." (Cal. Const., art. XI, § 7.) The standards governing our inquiry are well established. According to our Supreme Court: "The party claiming that general state law preempts a local ordinance has the burden of demonstrating preemption. [Citation.] We have been particularly 'reluctant to infer legislative intent to preempt a field covered by municipal regulation when there is a significant local interest to be served that may differ from one locality to another.' [Citations.] 'The common thread of the cases is that if there is a significant local interest to be served which may differ from one locality to another, then the presumption favors the validity of the local ordinance against an attack of state preemption.' [Citations.]

"Thus, when local government regulates in an area over which it traditionally has exercised control, such as . . . particular land uses, California courts will presume, absent a clear indication of preemptive intent from the Legislature, that such regulation is *not* preempted by state statute. [Citation.] The presumption against preemption accords with our more general understanding that 'it is not to be presumed that the legislature in the enactment of statutes intends to overthrow long-established principles of law unless such intention is made clearly to appear either by express declaration or by necessary implication.' [Citations.]

■ "Moreover, the 'general principles governing state statutory preemption of local land use regulation are well settled. . . . " 'Local legislation in conflict with general law is void. Conflicts exist if the ordinance duplicates [citations], contradicts [citation], or enters an area fully occupied by general law, either expressly or by legislative implication [citations].' " ' [Citation.]

"Local legislation is 'duplicative' of general law when it is coextensive therewith and 'contradictory' to general law when it is inimical thereto. Local legislation enters an area 'fully occupied' by general law when the Legislature has expressly manifested its intent to fully occupy the area or when it has impliedly done so in light of recognized indicia of intent. [Citation.]" (*Big Creek Lumber Co. v. County of Santa Cruz* (2006) 38 Cal.4th 1139, 1149–1150 [45 Cal.Rptr.3d 21, 136 P.3d 821], fn. omitted (*Big Creek*).)

There are three "recognized indicia of intent": " '(1) the subject matter has been so fully and completely covered by general law as to clearly indicate that is has become exclusively a matter of state concern; (2) the subject matter has been partially covered by general law couched in such terms as to indicate clearly that a paramount state concern will not tolerate further or additional local action; or (3) the subject matter has been partially covered by general law, and the subject is of such a nature that the adverse effect of a local ordinance on the transient citizens of the state outweighs the possible benefit to the' locality [citations]." (*Sherwin-Williams Co. v. City of Los Angeles* (1993) 4 Cal.4th 893, 898 [16 Cal.Rptr.2d 215, 844 P.2d 534].)

■ "With respect to the *implied* occupation of an area of law by the Legislature's full and complete coverage of it, this court recently had this to say: ' "Where the Legislature has adopted statutes governing a particular subject matter, its intent with regard to occupying the field to the exclusion of all local regulation is not to be measured alone by the language used but by the whole purpose and scope of the legislative scheme." ' [Citation.] We went on to say: ' "State regulation of a subject may be so complete and detailed as to indicate an intent to preclude local regulation." ' [Citation.] We thereafter observed: ' "Whenever the Legislature has seen fit to adopt a general scheme for the regulation of a particular subject, the entire control over whatever phases of the subject are covered by state legislation ceases as far as local legislation is concerned." ' [Citation.] When a local ordinance is identical to a state statute, it is clear that ' "the field sought to be covered by the ordinance has already been occupied" ' by state law. [Citation.]" (*O'Connell v. City of Stockton* (2007) 41 Cal.4th 1061, 1068 [63 Cal.Rptr.3d 67, 162 P.3d 583].)

■ To discern whether the local law has entered an area that has been "fully occupied" by state law according to the "recognized indicia of intent" requires an analysis that is based on an overview of the topic addressed by

the two laws. " 'In determining whether the Legislature has preempted by implication to the exclusion of local regulation we must look to the whole . . . scope of the legislative scheme.' " (*Big Creek, supra,* 38 Cal.4th 1139, 1157, quoting *People ex rel. Deukmejian v. County of Mendocino* (1984) 36 Cal.3d 476, 485 [204 Cal.Rptr. 897, 683 P.2d 1150]; accord, *American Financial Services Assn. v. City of Oakland* (2005) 34 Cal.4th 1239, 1252, 1261 [23 Cal.Rptr.3d 453, 104 P.3d 813]; *Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725, 751 [29 Cal.Rptr.2d 804, 872 P.2d 143].) Such an examination is made with the goal of " 'detect[ing] a patterned approach to the subject' " (*Fisher v. City of Berkeley* (1984) 37 Cal.3d 644, 707–708 [209 Cal.Rptr. 682, 693 P.2d 261], quoting *Galvan v. Superior Court* (1969) 70 Cal.2d 851, 862 [76 Cal.Rptr. 642, 452 P.2d 930]), and whether the local law mandates what state law forbids, or forbids what state law mandates. (*Big Creek, supra,* 38 Cal.4th 1139, 1161; *Great Western Shows, Inc. v. County of Los Angeles* (2002) 27 Cal.4th 853, 866 [118 Cal.Rptr.2d 746, 44 P.3d 120].)

Sequoia sees this as a case of express preemption, although it argues in the alternative that the Ordinance also falls to the concept of implied preemption. These contentions can only be evaluated with an appreciation of the sizable body of state legislation concerning mobilehome parks.

### The Extent of State Law in the Area of Mobilehome Regulation

Section 66427.5 does not stand alone. If the Legislature ever did leave the field of mobilehome park legislation to local control, that day is long past.

Since 1979, the state has had the Mobilehome Residency Law, which comprises almost 100 statutes governing numerous aspects of the business of operating a mobilehome park. (Civ. Code, §§ 798–799.10.) There are several provisions expressly ordering localities not to legislate in designated areas, such as the content of rental agreements (Civ. Code, § 798.17, subd. (a)(1)), and establishing specified exemptions from local rent control measures (Civ. Code, §§ 798.21, subd. (a), 798.45).[2] By this statutory scheme, the state has undertaken to "extensively regulate[] the landlord-tenant relationship between mobilehome park owners and residents." (*Greening v. Johnson* (1997) 53 Cal.App.4th 1223, 1226 [62 Cal.Rptr.2d 214]; accord, *SC Manufactured Homes, Inc. v. Canyon View Estates, Inc.* (2007) 148 Cal.App.4th 663, 673 [56 Cal.Rptr.3d 79]; *People ex rel. Kennedy v. Beaumont Investment, Ltd.* (2003) 111 Cal.App.4th 102, 109 [3 Cal.Rptr.3d 429].)

---

[2] The Mobilehome Residency Law has been construed as not otherwise preempting or precluding adoption of residential rent control. (See Civ. Code, § 1954.25; *Cacho v. Boudreau* (2007) 40 Cal.4th 341, 350 [53 Cal.Rptr.3d 43, 149 P.3d 473], and decisions cited.)

Even earlier, in 1967, the state enacted the Mobilehome Parks Act (Health & Saf. Code, §§ 18200–18700), which regulates the construction and installation of mobilehome parks in the state. (See *County of Santa Cruz v. Waterhouse* (2005) 127 Cal.App.4th 1483, 1489–1490 [26 Cal.Rptr.3d 543].) In this act, the Legislature expressly stated that it "supersedes any ordinance enacted by any city, county, or city and county, whether general law or chartered, applicable to this part." (Health & Saf. Code, § 18300, subd. (a).) The few exemptions from this prohibition are carefully delineated.[3]

Then there is the Manufactured Housing Act of 1980 (Health & Saf. Code, §§ 18000–18153), which regulates the sale, licensing, registration, and titling of mobilehomes. The Legislature declared that the provisions of this measure "apply to all parts of the state and supersede" any conflicting local ordinance. (Health & Saf. Code, § 18015.) The Department of Housing and Community Development (HCD) is in charge of enforcement. (Health & Saf. Code, §§ 18020, 18022, 18058.)

---

[3] "This part shall not prevent local authorities of any city, county, or city and county, within the reasonable exercise of their police powers, from doing any of the following:

"(1) From establishing, subject to the requirements of Sections 65852.3 and 65852.7 of the Government Code, certain zones for manufactured homes, mobilehomes, and mobilehome parks within the city, county, or city and county, or establishing types of uses and locations, including family mobilehome parks, senior mobilehome parks, mobilehome condominiums, mobilehome subdivisions, or mobilehome planned unit developments within the city, county, or city and county, as defined in the zoning ordinance, or from adopting rules and regulations by ordinance or resolution prescribing park perimeter walls or enclosures on public street frontage, signs, access, and vehicle parking or from prescribing the prohibition of certain uses for mobilehome parks.

"(2) From regulating the construction and use of equipment and facilities located outside of a manufactured home or mobilehome used to supply gas, water, or electricity thereto, except facilities owned, operated, and maintained by a public utility, or to dispose of sewage or other waste therefrom when the facilities are located outside a park for which a permit is required by this part or the regulations adopted pursuant thereto.

"(3) From requiring a permit to use a manufactured home or mobilehome outside a park for which a permit is required by this part or by regulations adopted pursuant thereto, and require a fee therefor by local ordinance commensurate with the cost of enforcing this part and local ordinance with reference to the use of manufactured homes and mobilehomes, which permit may be refused or revoked if the use violates this part or Part 2 (commencing with Section 18000), any regulations adopted pursuant thereto, or any local ordinance applicable to that use.

"(4) From requiring a local building permit to construct an accessory structure for a manufactured home or mobilehome when the manufactured home or mobilehome is located outside a mobilehome park, under circumstances when this part or Part 2 (commencing with Section 18000) and the regulations adopted pursuant thereto do not require the issuance of a permit therefor by the department [i.e., the state Department of Housing and Community Development].

"(5) From prescribing and enforcing setback and separation requirements governing the installation of a manufactured home, mobilehome, or mobilehome accessory structure or building installed outside of a mobilehome park." (Health & Saf. Code, § 18300, subd. (g).)

These statutory schemes indicate that the state is clearly the dominant actor on this stage. Under the Mobilehome Parks Act, it is the HCD, a state agency, not localities, that was entrusted with the authority to formulate "specific requirements relating to construction, maintenance, occupancy, use, and design" of mobilehome parks (Health & Saf. Code, § 18253; see also Health & Saf. Code, §§ 18552 [HCD to adopt "building standards" and "other regulations for . . . mobilehome accessory buildings or structures"], 18610 [HCD to "adopt regulations to govern the construction, use, occupancy, and maintenance of parks and lots within" mobilehome parks], 18620 [HCD to adopt "regulations regarding the construction of buildings in parks that it determines are reasonably necessary for the protection of life and property"], 18630 [plumbing], 18640 ["toilet, shower, and laundry facilities in parks"], 18670 ["electrical wiring, fixtures, and equipment . . . that it determines are reasonably necessary for the protection of life and property"].)

At present, the HCD has promulgated hundreds of regulations that are collected in chapter 2 of division 1 of title 25 of the California Code of Regulations. (Cal. Code Regs., tit. 25, §§ 1000–1758.) The regulations exhaustively deal with a myriad of issues, such as "Electrical Requirements" (*id.*, §§ 1130–1190), "Plumbing Requirements" (*id.*, §§ 1240–1284), "Fire Protection Standards" (*id.*, §§ 1300–1319), "Permanent Buildings and Commercial Modulars" (*id.*, §§ 1380–1400), and "Accessory Buildings and Structures" (*id.*, §§ 1420–1520). The regulations even deal with pet waste (*id.*, § 1114) and the prohibition of cooking facilities in cabanas (*id.*, § 1462).

Once adopted, HCD regulations "shall apply to all parts of the state." (Health & Saf. Code, § 18300, subd. (a).) Mobilehomes can only be occupied or maintained when they conform to the regulations. (Health & Saf. Code, §§ 18550, 18871.) Enforcement is shared between the HCD and local governments (Health & Saf. Code, § 18300, subd. (f), 18400, subd. (a)), with HCD given the power to "evaluate the enforcement" by units of local government. (Health & Saf. Code, § 18306, subd. (a).) A locality may decline responsibility for enforcement, but if assumed and not actually performed, its enforcement power may be taken away by the HCD. (Health & Saf. Code, § 18300, subds. (b)–(e).) Local initiative is restricted to traditional police powers of zoning, setback, permit requirements, and regulating construction of utilities. (Gov. Code, § 65852.7; Health & Saf. Code, § 18300, subd. (g), quoted at fn. 3, *ante.*)

It is the state that determines which events and actions in the construction and operation of a mobilehome park require permits. (Health & Saf. Code, §§ 18500, 18500.5, 18500.6, 18505; Cal. Code Regs., tit. 25, §§ 1006.5, 1010, 1014, 1018, 1038, 1306, 1324, 1374.5.) Even if the locality issues the annual permit for a park to operate, a copy must be sent to the HCD. (Cal.

Code Regs., tit. 25, §§ 1006.5, 1012.) It is the state that fixes the fees to be charged for these permits and certifications (Health & Saf. Code, §§ 18502, 18503; Cal. Code Regs., tit. 25, §§ 1008, 1020.4, 1020.7, 1025), and sets the penalties to be imposed for noncompliance (Health & Saf. Code, §§ 18504, 18700; Cal. Code Regs., tit. 25, §§ 1009, 1050, 1370.4). Sometimes, the state assumes exclusive responsibility for certain subjects, such as for earthquake-resistant bracing systems. (Cal. Code Regs., tit. 25, § 1370.4, subd. (a).)

Additional provisions respecting mobilehome parks are in the Government Code. Cities and counties cannot decide that a mobilehome park is not a permitted use "on all land planned and zoned for residential land use as designated by the applicable general plan," though the locality "may require a use permit." (Gov. Code, § 65852.7.) "[I]t is clear that the Legislature intended to limit local authority for zoning regulation to the specifically enumerated exceptions [in Health and Safety Code section 18300, subdivision (g), quoted at footnote 3, *ante*] of where a mobilehome park may be located, vehicle parking, and lot lines, not the structures within the parks." (*County of Santa Cruz v. Waterhouse, supra*, 127 Cal.App.4th 1483, 1493, italics omitted.) A city or county must accept installation of mobilehomes manufactured in conformity with federal standards. (Gov. Code, § 65852.3, subd. (a).) Their power to impose rent control on mobilehome parks is restricted if the park qualifies as "new construction." (Gov. Code, § 65852.11, subd. (a); cf. text accompanying fn. 2, *ante*.)

This survey demonstrates that the state has a long-standing involvement with mobilehome regulation, the extent of which involvement is, by any standard, considerable. Having outlined the size of the state's regulatory footprint, it is now time to examine the details of section 66427.5 and the Ordinance.

## Section 66427.5

Section 66427.5 is a fairly straightforward statute addressing the subject of how a subdivider shall demonstrate that a proposed mobilehome park conversion will avoid economic displacement of current tenants who do not choose to become purchasing residents. In its entirety it provides as follows:

"At the time of filing a tentative or parcel map for a subdivision to be created from the conversion of a rental mobilehome park to resident ownership, the subdivider shall avoid the economic displacement of all nonpurchasing residents in the following manner:

"(a) The subdivider shall offer each existing tenant an option to either purchase his or her condominium or subdivided unit, which is to be created by the conversion of the park to resident ownership, or to continue residency as a tenant.

"(b) The subdivider shall file a report on the impact of the conversion upon residents of the mobilehome park to be converted to resident owned subdivided interest.

"(c) The subdivider shall make a copy of the report available to each resident of the mobilehome park at least 15 days prior to the hearing on the map by the advisory agency or, if there is no advisory agency, by the legislative body.

"(d)(1) The subdivider shall obtain a survey of support of residents of the mobilehome park for the proposed conversion.

"(2) The survey of support shall be conducted in accordance with an agreement between the subdivider and a resident homeowners' association, if any, that is independent of the subdivider or mobilehome park owner.

"(3) The survey shall be obtained pursuant to a written ballot.

"(4) The survey shall be conducted so that each occupied mobilehome space has one vote.

"(5) The results of the survey shall be submitted to the local agency upon the filing of the tentative or parcel map, to be considered as part of the subdivision map hearing prescribed by subdivision (e).

"(e) The subdivider shall be subject to a hearing by a legislative body or advisory agency, which is authorized by local ordinance to approve, conditionally approve, or disapprove the map. The scope of the hearing shall be limited to the issue of compliance with this section.

"(f) The subdivider shall be required to avoid the economic displacement of all nonpurchasing residents in accordance with the following:

"(1) As to nonpurchasing residents who are not lower income households, as defined by Section 50079.5 of the Health and Safety Code, the monthly rent, including any applicable fees or charges for use of any preconversion amenities, may increase from the preconversion rent to market levels, as defined in an appraisal conducted in accordance with nationally recognized professional appraisal standards, in equal annual increases over a four-year period.

"(2) As to nonpurchasing residents who are lower income households, as defined by Section 50079.5 of the Health and Safety Code, the monthly rent, including any applicable fees or charges for use of any preconversion amenities, may increase from the preconversion rent by an amount equal to the average monthly increase in rent in the four years immediately preceding the conversion, except that in no event shall the monthly rent be increased by an amount greater than the average monthly percentage increase in the Consumer Price Index for the most recently reported period."

This is how section 66427.5 currently reads. But its antecedents are instructive.

The first version of section 66427.5, enacted in 1991, was no more than the first paragraph and subdivision (f) of the current version. (Stats. 1991, ch. 745, § 2, p. 3324.) The statute was substantially amended four years later with most of what is in the current version. The only significant variance is that the 1995 version did not contain what is now subdivision (d), specifying that the subdivider is to provide a survey of support. (Stats. 1995, ch. 256, § 5, p. 883.) The second version of section 66427.5 was the one considered by the Court of Appeal in *El Dorado Palm Springs, Ltd. v. City of Palm Springs* (2002) 96 Cal.App.4th 1153 [118 Cal.Rptr.2d 15] (*El Dorado*).

At issue in *El Dorado* was a mobilehome park owner's application to convert its units from rental to resident owned. The renters opposed the conversion, "contending that they do not have enough information to decide whether to purchase or not, and the proposed conversion is merely a sham to avoid [Palm Springs's] rent control ordinance." (*El Dorado, supra*, 96 Cal.App.4th 1153, 1159.) The Palm Springs City Council approved the application, but made its approval subject to three conditions, requiring: "(1) the use of a 'Map Act Rent Date,' defined as the date of the close of escrow of not less than 120 lots; (2) the use of a sale price established by a specified appraisal firm, the appraisal costs to be paid by [the owner-subdivider]; and (3) financial assistance to all residents in the park to facilitate their purchase of the lots underlying their mobilehomes." (*Id.* at p. 1157.)

The trial court denied the park owner's petition for a writ of administrative mandamus. The owner appealed, contending "that its application for subdivision is governed by section 66427.5. It relies on subdivision (d) [now subd. (e)] of that section, which states, in part, that the scope of the City Council's hearing is limited to the issue of compliance with the requirements of that section." (*El Dorado, supra*, 96 Cal.App.4th 1153,

1157–1158.) Palm Springs took the position that the conditions were authorized by Government Code section 66427.4, subdivision (c),[4] which authorized the city council to " 'require the subdivider to take steps to mitigate any adverse impact of the conversion on the ability of displaced mobilehome park residents to find adequate space in a mobilehome park.' " (96 Cal.App.4th at p. 1158.)

The Court of Appeal agreed with the owner and reversed. It rejected Palm Springs's argument about section 66427.4,[5] concluding that it applied only when the mobilehome park is being converted to another use: "[I]t would not apply to conversion of a mobilehome park when the property's use as a mobilehome park is unchanged. The section would only apply if the mobilehome park was being converted to a shopping center or another different use of the property. In that situation, there would be 'displaced mobilehome park residents' who would need to find 'adequate space in a mobilehome park' for their mobilehomes and themselves." (*El Dorado, supra*, 96 Cal.App.4th 1153, 1161.) The court also held the language of subdivision (e) of section 66427.4 dispositive on this point. (96 Cal.App.4th at pp. 1161–1163.)

█ But, and as particularly apt here, the court sustained the park owner's argument about section 66427.5, subdivision (d), concluding that under it the city council "only had the power to determine if [the subdivider] had complied with the requirements of the section." (*El Dorado, supra*, 96 Cal.App.4th 1153, 1163–1164.) Although the court did appear concerned that the conversion process might be used for improper purposes—such as the bogus purchase of a single unit by the subdivider/owner to avoid local rent control—it believed the language of section 66427.5, subdivision (d), did not allow such considerations to be taken into account: "[T]he City lacks

---

[4] Subsequent statutory references are to the Government Code unless otherwise indicated.

[5] At all relevant times, section 66427.4 has provided:

"(a) At the time of filing a tentative or parcel map for a subdivision to be created from the conversion of a mobilehome park to another use, the subdivider shall also file a report on the impact of the conversion upon the displaced residents of the mobilehome park to be converted. In determining the impact of the conversion on displaced mobilehome park residents, the report shall address the availability of adequate replacement space in mobilehome parks.

"(b) The subdivider shall make a copy of the report available to each resident of the mobilehome park at least 15 days prior to the hearing on the map by the advisory agency or, if there is no advisory agency, by the legislative body.

"(c) The legislative body, or an advisory agency which is authorized by local ordinance to approve, conditionally approve, or disapprove the map, may require the subdivider to take steps to mitigate any adverse impact of the conversion on the ability of displaced mobilehome park residents to find adequate space in a mobilehome park.

"(d) This section establishes a minimum standard for local legislation of conversions of mobilehome parks into other uses and shall not prevent a local agency from enacting more stringent measures.

"(e) This section shall not be applicable to a subdivision which is created from the conversion of a rental mobilehome park to resident ownership."

authority to investigate or impose additional conditions to prevent sham or fraudulent transactions at the time it approves the tentative or parcel map. Although the lack of such authority may be a legislative oversight, and although it might be desirable for the Legislature to broaden the City's authority, it has not done so. We therefore agree with appellant that the argument that the Legislature should have done more to prevent partial conversions or sham transactions is a legislative issue, not a legal one."[6] (96 Cal.App.4th at p. 1165.) And, the court later noted, "there is no evidence that [the owner's] filing of an application for approval of a tentative parcel map is not the beginning of a bona fide conversion to resident ownership . . . ." (*Id.* at p. 1174, fn. 17.)

■ One other point of *El Dorado* is significant. The court specifically rejected arguments that would require a numerical threshold before a conversion could proceed, there being no statutory support for the claim that conversion only occurred if more than 50 percent of the lots have been sold before a tentative or parcel map is filed. (*El Dorado, supra,* 96 Cal.App.4th 1153, 1172–1173.) The court refused to require a subdivider to demonstrate that the proposed subdivision has the support of a majority of existing residents—fixed at either one-half or two-thirds—thus satisfying the local authority that this was not a "forced conversion."[7] (96 Cal.App.4th at pp. 1181–1182.) The court concluded: "The legislative intent to encourage

---

[6] Nevertheless, the *El Dorado* court did seem to indicate that there was an available remedy for Palm Springs's fears concerning evasion of its rent control ordinance. Although local authorities could not themselves use section 66427.5 to halt "sham or failed transactions in which a single unit is sold, but no others" (*El Dorado, supra,* 96 Cal.App.4th 1153, 1166, fn. 10), there was no such restriction on the judiciary. "[T]he courts will not apply section 66427.5 to sham or failed transactions" (*id.* at p. 1165), which the *El Dorado* court apparently equated with situations where "conversion fails" or "if the conversion is unsuccessful" (*id.* at p. 1166). The court also agreed with an earlier decision that held section 66427.5 does not apply unless there is an actual sale of at least one unit. (*El Dorado, supra,* at pp. 1166, 1177–1179, citing *Donohue v. Santa Paula West Mobile Home Park* (1996) 47 Cal.App.4th 1168 [55 Cal.Rptr.2d 282].)

[7] The 50 percent argument was based on Health and Safety Code section 50781, subdivision (m), which specifies that one of the definitions of "resident ownership" is "ownership by a resident organization of an interest in a mobilehome park that entitles the resident organization to control the operations of the mobilehome park." The argument was that "resident ownership of the park, and control of operations of the park, can only occur when the purchasing residents have the ability to control, manage and own the common facilities in the park, i.e., when 50 percent plus 1 of the lots have been purchased by the residents." (*El Dorado, supra,* 96 Cal.App.4th 1153, 1172, 1181.) The two-thirds figure was taken from Government Code section 66428.1, which provides that "When at least two-thirds of the owners of mobilehomes who are tenants in the mobilehome park sign a petition indicating their intent to purchase the mobilehome park for purposes of converting it to resident ownership, and a field survey is performed, the requirement for a parcel map or a tentative and final map shall be waived . . . ," subject to specified exceptions.

conversion of mobilehome parks to resident ownership would not be served by a requirement that a conversion could only be made with resident consent." (*Id.* at p. 1182.)

Following *El Dorado*, the continuing problem of mobilehome park conversion, and the phrase "bona fide," again engaged the Legislature's attention. That same year the Legislature amended section 66427.5 by adding what is now subdivision (d) and the requirement of a "survey of support of residents" whose results were to be filed with the tentative or parcel map. As it did so, the Legislature enacted the following language, but did not include it as part of section 66427.5: "It is the intent of the Legislature to address the conversion of a mobilehome park to resident ownership that is not a bona fide resident conversion, as described by the Court of Appeal in El Dorado Palm Springs, Ltd. v. City of Palm Springs[, *supra*,] 96 Cal.App.4th 1153. The court in this case concluded that the subdivision map approval process specified in Section 66427.5 of the Government Code may not provide local agencies with the authority to prevent nonbona fide resident conversions. The court explained how a conversion of a mobilehome park to resident ownership could occur without the support of the residents and result in economic displacement. It is, therefore, the intent of the Legislature in enacting this act to ensure that conversions pursuant to Section 66427.5 of the Government Code are bona fide resident conversions." (Stats. 2002, ch. 1143, § 2.)[8]

## The Ordinance

The Ordinance has eight sections, but only three—sections I, II, and III—are pertinent to this appeal.[9]

---

[8] This is what is known as a "plus section," which our Supreme Court termed "a provision of a bill that is not intended to be a substantive part of the code section or general law that the bill enacts, but to express the Legislature's view on some aspect of the operation or effect of the bill. Common examples of 'plus sections' include severability clauses, saving clause, statements of the fiscal consequences of the legislation, provisions giving the legislation immediate effect or a delayed operative date or a limited duration, and provisions declaring an intent to overrule a specific judicial decision or an intent not to change existing law." (*People v. Allen* (1999) 21 Cal.4th 846, 858–859, fn. 13 [89 Cal.Rptr.2d 279, 984 P.2d 486].) The court subsequently explained that "statements of the intent of the enacting body . . . , while not conclusive, are entitled to consideration. [Citations.] Although such statements in an uncodified section do not confer power, determine rights, or enlarge the scope of a measure, they properly may be utilized as an aid in construing a statute." (*People v. Canty* (2004) 32 Cal.4th 1266, 1280 [14 Cal.Rptr.3d 1, 90 P.3d 1168].)

[9] Section IV of the Ordinance declares that the measure is "categorically exempt from environmental review" under the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.). Section V is a severability provision. Section VI establishes the effective date of the Ordinance as "30 days after the date of its passage." Section VII repeals an existing ordinance. Section VIII (mislabeled as "Section VI") provides for publication of the Ordinance in a specified newspaper of general circulation in the county.

Section I declares the purposes of the Ordinance. It opens with the supervisors' finding that "the adoption of this Ordinance is necessary and appropriate to implement certain policies and programs set forth within the adopted General Plan Housing Element, and to comply with state laws related to the conversion of mobile home parks to resident ownership." Specific purposes included: (1) "To implement state laws with regard to the conversion of mobile home parks to resident ownership"; (2) "To ensure that conversions of mobile home parks to resident ownership are bona fide resident conversions in accordance with state law"; (3) "To implement the goals and policies of the General Plan Housing Element"; (4) "To balance the need for increased homeownership opportunities with the need to protect existing rental housing opportunities"; (5) "To provide adequate disclosure to decision-makers and to prospective buyers prior to conversion of mobile home parks to resident ownership"; (6) "To ensure the public health and safety in converted parks"; and (7) "To conserve the County's affordable housing stock."

Section II deals with the "Applicability" of the Ordinance by declaring that "These provisions apply to all conversions of mobile home parks to resident ownership, except those conversions for which mapping requirements have been waived pursuant to Government Code [Section] 66428.1 These provisions do not apply to the conversion of a mobile home park to an alternate use, which conversions are regulated by Government Code Sections 65863.7 and 66427.4, and by Section 26-92-090 of Chapter 26 of the Sonoma County Code."

Section III opens by providing several definitions of terms used in the Ordinance and in chapter 25 of the Sonoma County Code.

" 'Mobile Home Park Conversion to Resident Ownership means the conversion of a mobile home park composed of rental spaces to a condominium or common interest development, as described in and/or regulated by Government Code Sections 66427.5 and/or 66428.1.' "

" 'Mobile Home Park Closure, Conversion or Change of Use means changing the use of a mobile home park such that it no longer contains occupied mobile or manufactured homes, as described in and regulated by Government Code Section 66427.4.' "

" 'Subdivision[] means the division of any improved or unimproved land, shown on the latest equalized county assessment roll as a unit or as contiguous units, for the purpose of sale, lease, financing, conveyance, transfer or any other purpose, whether immediate or future. Property shall be considered as contiguous units, even if it is separated by roads, streets, utility

easement or railroad rights-of-way. Subdivision includes a condominium project or common interest development, as defined in Section 1351 of the Civil Code or a community apartment project, as defined in Section 11004 of the Business and Professions Code. Any conveyance of land to a governmental agency, public entity or public utility shall not be considered a division of land for purposes of computing the number of parcels.' "

The heart of the Ordinance is subdivision (d) of Section III, which adds "a new Article IIIB" to chapter 25 of the Sonoma County Code. Because of its importance, we quote it in full:

"Article IIIB. Mobile Home Park Conversions to Resident Ownership.

"25-39.7 (a) Applicability. The provisions of this Article IIIB shall apply to all conversions of mobile home parks to resident ownership except those conversions for which mapping requirements have been waived pursuant to Government Code § 66428.1.

"25-39.7 (b) Application Materials Required.

"(1) In addition to any other information required by this Code and/or other applicable law, the following information is required at the time of filing of an application for conversion of a mobile home park to resident ownership:

"a) A survey of resident support conducted in compliance with subdivision (d) of Government Code Section 66427.5 The subdivider shall demonstrate that the survey was conducted in accordance with an agreement between the subdivider and an independent resident homeowners association, if any, was obtained pursuant to a written ballot, and was conducted so that each occupied mobile home space had one vote. The completed survey of resident support ballots shall be submitted with the application. In the event that more than one resident homeowners association purports to represent residents in the park, the agreement shall be with the resident homeowners association which represent the greatest number of resident homeowners in the park.

"b) A report on the impact of the proposed conversion on residents of the mobile home park. The tenant impact report shall, at a minimum include all of the following:

"i) Identification of the number of mobile home spaces in the park and the rental rate history for each such space over the four years prior to the filing of the application;

"ii) Identification of the anticipated method and timetable for compliance with Government Code Section 66427.5 (a), and, to the extent available, identification of the number of existing tenant households expected to purchase their units within the first four (4) years after conversion;

"iii) Identification of the method and anticipated time table for determining the rents for non-purchasing residents pursuant to Government Code Section 66427.5 (f)(1), and, to the extent available, identification of the number of tenant households likely to be subject to these provisions;

"iv) Identification of the method for determining and enforcing the controlled rents for non-purchasing households pursuant to Government Code Section 66427.5 (f)(2), and, to the extent available, identification of the number of tenant households likely to be subject to these provisions;

"v) Identification of the potential for non-purchasing residents to relocate their homes to other mobile home parks within Sonoma County, including the availability of sites and the estimated cost of home relocation;

"vi) An engineer's report on the type, size, current condition, adequacy, and remaining useful life of common facilities located within the park, including but not limited to water systems, sanitary sewer, fire protection, storm water, streets, lighting, pools, playgrounds, community buildings and the like. A pest report shall be included for all common buildings and structures. 'Engineer' means a registered civil or structural engineer, or a licensed general engineering contractor;

"vii) If the useful life of any of the common facilities or infrastructure is less than thirty (30) years, a study estimating the cost of replacing such facilities over their useful life, and the subdivider's plan to provide funding for the same;

"viii) An estimate of the annual overhead and operating costs of maintaining the park, its common areas and landscaping, including replacement costs as necessary, over the next thirty (30) years, and the subdivider's plan to provide funding for same.

"ix) Name and address of each resident, and household size.

"x) An estimate of the number of residents in the park who are seniors or disabled. An explanation of how the estimate was derived must be included.

"(c) A maintenance inspection report conducted on site by a qualified inspector within the previous twelve (12) calendar months demonstrating

compliance with Title 25 of the California Code of Regulations ('Title 25 Report'). Proof of remediation of any Title 25 violations shall be confirmed in writing by the California Department of Housing and Community Development (HCD).

"25-39.7 (c) Criteria for Approval of Conversion Application.

"(1) An application for the conversion of a mobile home park to resident ownership shall be approved only if the decision maker finds that:

"a) A survey of resident support has been conducted and the results filed with the Department in accordance with the requirements of Government Code Section 66427.5 and this Chapter;

"b) A tenant impact report has been completed and filed with the Department in accordance with the requirements of Government Code Section 66427.5 and this Chapter;

"c) The conversion to resident ownership is consistent with the General Plan, any applicable Specific or Area Plan, and the provisions of Chapter 26 of the Sonoma County Code;

"d) The conversion is a bona-fide resident conversion;

"e) Appropriate provision has been made for the establishment and funding of an association or corporation adequate to ensure proper long-term management and maintenance of all common facilities and infrastructure; and

"f) There are no conditions existing in the mobile home park that are detrimental to public health or safety, provided, however, that if any such conditions exist, the application for conversion may be approved if: (1) all of the findings required under subsections (a) through (e) are made and (2) the subdivider has instituted corrective measures adequate to ensure prompt and continuing protection of the health and safety of park residents and the general public.

"(2) For purposes of determining whether a proposed conversion is a bona-fide resident conversion, the following criteria shall be used:

"a) Where the survey of resident support conducted in accordance with Government Code Section 66427.5 and with this Chapter shows that more than 50% of resident households support the conversion to resident ownership, the conversion shall be presumed to be a bona-fide resident conversion.

"b) Where the survey of resident support conducted in accordance with Government Code Section 66427.5 and with this Chapter shows that at least 20% but not more than 50% of residents support the conversion to resident ownership, the subdivider shall have the burden of demonstrating that the proposed conversion is a bona-fide resident conversion. In such cases, the subdivider shall demonstrate, at a minimum, that a viable plan, with a reasonable likelihood of success as determined by the decision-maker, is in place to convey the majority of the lots to current residents of the park within a reasonable period of time.

"c) Where the survey of support conducted in accordance with Government Code Section 66427.5 and with this Chapter shows that less than 20% of residents support the conversion to resident ownership, the conversion shall be presumed not to be a bona-fide resident conversion.

"25-39.7 (d) Tenant Notification. The following tenant notifications are required:

"(1) Tenant Impact Report. The subdivider shall give each resident household a copy of the impact report required by Government Code Section 66427.5 (b) within fifteen days after completion of such report, but in no case less than fifteen (15) days prior to the public hearing on the application for conversion. The subdivider shall also provide a copy of the report to any new or prospective residents following the original distribution of the report.

"(2) Exclusive Right to Purchase. If the application for conversion is approved, the subdivider shall give each resident household written notice of its exclusive right to contract for the purchase of the dwelling unit of space it occupies at the same or more favorable terms and conditions than those on which such unit or space shall be initially offered to the general public. The right shall run for a period of not less than ninety (90) days from the issuance of the subdivision public report ('white paper') pursuant to California Business and Professions Code § 11018.2, unless the subdivider received prior written notice of the resident's intention not to exercise such right.

"(3) Right to Continue Residency as Tenant. If the application for conversion is approved, the subdivider shall give each resident household written notice of its right to continue residency as a tenant in the park as required by Government Code § 66427.5 (a)."

### The Ordinance Is Expressly Preempted by Section 66427.5

██ It is a given that regulation of the uses of land within its territorial jurisdiction is one of the traditional powers of local government. (E.g., *Big*

*Creek, supra,* 38 Cal.4th 1139, 1151; *IT Corp. v. Solano County Board of Supervisors* (1991) 1 Cal.4th 81, 85, 95, 99 [2 Cal.Rptr.2d 513, 820 P.2d 1023]; *City of Burbank v. Burbank-Glendale-Pasadena Airport Authority* (1999) 72 Cal.App.4th 366, 376 [85 Cal.Rptr.2d 28].) We are also mindful that our Supreme Court has twice held, prior to enactment of section 66427.5, that the Subdivision Map Act did not preempt local authority to regulate residential condominium conversions. (*Griffin Development Co. v. City of Oxnard* (1985) 39 Cal.3d 256, 262–266 [217 Cal.Rptr. 1, 703 P.2d 339]; *Santa Monica Pines, Ltd. v. Rent Control Board* (1984) 35 Cal.3d 858, 868–869 [201 Cal.Rptr. 593, 679 P.2d 27].) Given the presumption against preemption (*Big Creek, supra,* 38 Cal.4th 1139, 1149), we start by assuming that the Ordinance is valid.

However, this attitude does not long survive. The survey of state legislation already undertaken demonstrates that the state has taken for itself the commanding voice in mobilehome regulation. Localities are allowed little scope to improvise or deviate from the Legislature's script. The state's dominance was in place before the subject of mobilehome park conversion was introduced into the Subdivision Map Act in 1991. (See Stats. 1991, ch. 745, §§ 1–2, 4, pp. 3323, 3324, 3325, adding §§ 66427.5, 66428.1 & amending § 66427.4 to cover mobilehome park conversions.) This was seven years after the state had declared itself in favor of converting mobilehome parks to resident ownership, and at the same time established the Mobile-home Park Purchase Fund from which the HCD could make loans to low-income residents and resident organizations to facilitate conversions. (Stats. 1984, ch. 1692, § 2, p. 6114, adding Health & Saf. Code, §§ 50780–50786.)

Although the Court of Appeal in *El Dorado* did not explicitly hold that section 66427.5 was an instance of express preemption, that is clearly how it read the statute. And although there is nothing in the text of section 66427.5 that at first glance looks unambiguously like a stay-away order from the Legislature to cities and counties,[10] there is no doubt that the *El Dorado* court construed the operative language as precluding addition by cities or counties. That operative language reads: "The subdivider shall be subject to a hearing by a legislative body or advisory agency, which is authorized by local ordinance to approve, conditionally approve, or disapprove the [tentative or parcel] map. *The scope of the hearing shall be limited to the issue of compliance with this section.*" (§ 66427.5, subd. (e), italics added.) The

---

[10] Such as the provision of the Mobilehome Parks Act directing that "This part applies to all parts of the state and supersedes any ordinance enacted by any city, county, or city and county, whether general law or chartered, applicable to this part." (Health & Saf. Code, § 18300, subd. (a).)

italicized language is, in its own way, comprehensive. But the contrasting constructions the parties give it could not be more starkly divergent.

According to Sequoia, section 66427.5 has an almost ministerial operation. The words of the statute "communicate unambiguously that local agencies must approve a mobilehome park subdivision map if the applicant complies with 'this section' alone." The County and supporting amici curiae argue that section 66427.5 and *El Dorado* are not dispositive here. Indeed, they almost argue that the statute and the decision are not relevant. As they see it, section 66427.5—both before and after *El Dorado*—is a statute of very modest scope, addressing itself only to the issue of avoiding and mitigating the economic displacement of residents who will not be purchasing units when the mobilehome park is converted. All the Ordinance does, they maintain, is "implement" and flesh out the details of the Legislature's directive in a wholly appropriate fashion, leaving unimpaired the traditional local authority over land uses. As the amici curiae state it: "Ordinance No. 5725 does not purport to impose any additional economic restrictions to preserve affordability or to avoid displacement."

We admit that there is no little attraction to the County's approach. Beginning with the presumption against preemption in the area of land use, it is more than a little difficult to see the Legislature as accepting that approval of a conversion plan is dependent only on the issues of resident support and the subdivider's efforts at avoiding economic displacement of nonpurchasing residents. Section 66427.5 does employ language that seems to accept, if not invite, supplementary local action.[11] For example, a subdivider is required to "file a report on the impact of the conversion upon residents" (§ 66427.5, subd. (b)), but the Legislature made no effort to spell out the contents of such a report. And there is some force to the rhetorical inquiry posed by amici curiae: "Surely, the Legislature intended that the report have substantive content . . . . [¶] . . . [¶] If there can be no assurance as to the contents of the [report], it may become a meaningless exercise."

However, a careful examination of the relevant statutes extracts much of the appeal in the County's approach. There are three such statutes—sections 66427.4, 66427.5, and 66428.1. And if they are considered as a unit—which

[11] The County and supporting amici curiae note our Supreme Court stating that the Subdivision Map Act "sets suitability, design, improvement and procedural requirements [citations] and allows local governments to impose *supplemental requirements of the same kind*." (*The Pines v. City of Santa Monica* (1981) 29 Cal.3d 656, 659 [175 Cal.Rptr. 336, 630 P.2d 521], italics added.) It must be emphasized, however, that the court's comments were made in the context of a local tax—and a decade before the subject of mobilehome park conversion began appearing in the Subdivision Map Act.

they are, as the three mobilehome conversion statutes in the Subdivision Map Act[12]—a coherent logic begins to emerge.

It must be recalled that the predicate of the statutory examination is a functioning park with existing tenants with all necessary permits and inspections needed for current operation. As Sequoia points out: "Mobilehome parks being converted under section 66427.5 have already been mapped out, plotted out, approved under zoning and general plans, and subjected to applicable health and safety regulations." Moreover, the park has been inspected and relicensed on an annual basis. But the owner has decided to change. If the change is to close the park and devote the land to a different use, section 66427.4 governs. If the change is a more modest switch to residential conversion, sections 66427.5 and 66428.1 are applicable.

These statutes form a rough continuum. If the owner is planning a new use, that is, leaving the business of operating a mobilehome park, section 66427.4 (quoted in full at fn. 5, *ante*) directs the owner to prepare a report on the impact of the change to tenants or residents. (§ 66427.4, subd. (a).) The relevant local authority "may require the subdivider to take steps to mitigate any adverse impact of the conversion on the ability of displaced mobilehome park residents to find adequate space in a mobilehome park" as a condition of approving or conditionally approving the change. (*Id.*, subd. (c).) But in this situation—where the land use question is essentially reopened de novo—section 66427.4 explicitly authorizes local input: "This section establishes *a minimum standard for local regulation* of conversions of mobilehome parks into other uses *and shall not prevent a local agency from enacting more stringent measures.*" (*Id.*, subd. (d), italics added.)

At the other end of the continuum is the situation covered by section 66428.1, subdivision (a), which provides: "When at least two-thirds of the owners of mobilehomes who are tenants in the mobilehome park sign a petition indicating their intent to purchase the mobilehome park for purposes of converting it to resident ownership, and a field survey is performed, the requirement for a parcel map or a tentative and final map shall be waived unless any of the following conditions exist: [¶] (1) There are design or improvement requirements necessitated by significant health or safety concerns. [¶] (2) The local agency determines that there is an exterior boundary discrepancy that requires recordation of a new parcel or tentative and final map. [¶] (3) The existing parcels which exist prior to the proposed conversion

---

[12] Because sections 66427.4, 66427.5, and 66428.1 all deal with the subject of mobilehome park conversions, it is appropriate to consider them together. (E.g., *Walker v. Superior Court* (1988) 47 Cal.3d 112, 124, fn. 4 [253 Cal.Rptr. 1, 763 P.2d 852]; *County of Los Angeles v. Frisbie* (1942) 19 Cal.2d 634, 639 [122 P.2d 526]; *In re Washer* (1927) 200 Cal. 599, 606 [254 P. 951].)

were not created by a recorded parcel or final map. [¶] (4) The conversion would result in the creation of more condominium units or interests than the number of tenant lots or spaces that exist prior to conversion."

So, if the conversion essentially maintains an acceptable status quo, the conversion is approved by operation of law. And the locality has no opportunity or power to stop it, or impose conditions for its continued operation.

Section 66427.5 occupies the midway point on the continuum. It deals with the situation where the mobilehome park will continue to operate as such, merely transitioning from a rental to an ownership basis, and there is not two-thirds tenant support for the change—in other words, conversions that enjoy a level of tenant concurrence that does not activate the free ride authorized by section 66428.1. In those situations, the local authority enjoys less power than granted by section 66427.4, but more than conversions governed by 66428.1. It is not surprising that in this middle situation, the Legislature would see fit to grant local authorities some power, but circumscribe the extent of that power. That is what section 66427.5 does. It says in effect: Local authority, you have this power, but no more.

As previously mentioned, the Legislature amended section 66427.5 in the wake of *El Dorado*. Two features of that amendment are notable. First, the Legislature added what is now the requirement in subdivision (d) of a survey of tenant support for the conversion, when the level of that support does not reach the two-thirds mark at which point section 66428.1 kicks in. But the Legislature did not address the point noted in *El Dorado* that there is no minimum amount of tenant support required for a conversion to be approved. (See *El Dorado, supra,* 96 Cal.App.4th 1153, 1172–1173.) As this was the only addition to the statute, if follows that it was deemed sufficient to address the problem of "bona fide" conversions mentioned in the unmodified portion of the enactment that accompanied the amendment.

■ Second, and even more significant for our purposes, the *El Dorado* court expressly read section 66427.5 as not permitting a local authority to inject any other consideration into its decision whether to approve a subdivision conversion.[13] (*El Dorado, supra,* 96 Cal.App.4th 1153, 1163–1164, 1166,

---

[13] *El Dorado* is also authority for rejecting the County's attempt to narrow the scope of the section 66427.5 hearing to just the issue of tenant displacement, thereby presumably leaving other issues or concerns of the conversion application to be addressed at a different hearing. The *El Dorado* court treated the section 66427.5 hearing as the equivalent of "El Dorado's application for approval of the tentative subdivision map." (*El Dorado, supra,* 96 Cal.App.4th 1153, 1163–1164; see also *id.,* at pp. 1174 ["section 66427.5 applies to El Dorado's application for tentative map approval . . ."], 1182 [absence of majority tenant support for conversion not dispositive because "The owner can still subdivide his property by following . . . section 66427.5"; judgment reversed "with directions to require the City Council to promptly

1182.) And when it amended section 66427.5, the Legislature did nothing to overturn the *El Dorado* court's reading of the extent of local power to step beyond the four corners of that statute. This is particularly telling: " '[W]hen the Legislature amends a statute without altering portions of the provision that have previously been judicially construed, the Legislature is presumed to have been aware and to have acquiesced in the previous judicial construction. Accordingly, reenacted portions of the statute are given the same construction they received before the amendment.' " (*Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1156 [278 Cal.Rptr. 614, 805 P.2d 873], quoting *Marina Point, Ltd. v. Wolfson* (1982) 30 Cal.3d 721, 734 [180 Cal.Rptr. 496, 640 P.2d 115]; accord, *People v. Meloney* (2003) 30 Cal.4th 1145, 1161 [135 Cal.Rptr.2d 602, 70 P.3d 1023]; *People v. Ledesma* (1997) 16 Cal.4th 90, 100–101 [65 Cal.Rptr.2d 610, 939 P.2d 1310].)

The foregoing analysis convinces us that the *El Dorado* construction of section 66427.5 has stood the test of time and received the tacit approval of the Legislature. We therefore conclude that what is currently subdivision (e) of section 66427.5 continues to have the effect of an express preemption of the power of local authorities to inject other factors when considering an application to convert an existing mobilehome park from a rental to a resident-owner basis.

### The Ordinance Is Impliedly Preempted

As previously shown, local law is invalid if it enters a field fully occupied by state law, or if it duplicates, contradicts, or is inimical, to state law. (*O'Connell v. City of Stockton, supra,* 41 Cal.4th 1061, 1068; *Big Creek, supra,* 38 Cal.4th 1139, 1150.) The three tests for implied preemption are: (1) the issue has been so completely covered by state law as to indicate that the issue is now exclusively a state concern; (2) the issue has been only partially covered by state law, but the language of the state law indicates that the state interest will not tolerate additional local input; and (3) the issue has been only partially covered by state law, but the negative impact of local legislation on the state interest is greater than whatever local benefits derive from the local legislation. (*O'Connell v. City of Stockton, supra,* at p. 1068; *Morehart v. County of Santa Barbara, supra,* 7 Cal.4th 725, 751; *People ex rel. Deukmejian v. County of Mendocino, supra,* 36 Cal.3d 476, 485.) We conclude that the County's Ordinance is also vulnerable to two of the tests for implied preemption.

---

determine the sole issue of whether El Dorado's application for approval of a tentative parcel map complies with section 66427.5"].) Even more germane is that, to judge from the language used in the uncodified provision enacted with the amendment of section 66427.5, the Legislature clearly appeared to equate compliance with section 66427.5 with the conversion approval process.

The overview of the regulatory schemes touching mobilehomes undertaken earlier in this opinion demonstrates that the state's involvement is extensive and comprehensive. Grants of power to cities and counties are few in number, guarded in language, and invariably qualified in scope. Nevertheless, those grants do exist. Section 66427.5 shows that the state is willing to allow some local participation in some aspects of mobilehome conversion; and section 66427.4 shows that in one setting—when a mobilehome park is converted to a different use—it is virtually expected that the state role will be secondary. The first test for implied preemption cannot be established.

But the three-statute continuum discussed earlier in connection with express preemption also shows that the second and third tests for implied preemption are.

For 25 years, the state has had the policy "to encourage and facilitate the conversion of mobilehome parks to resident ownership." (Health & Saf. Code, § 50780, subd. (b).) The state is even willing to use public dollars to promote this policy. (Health & Saf. Code, § 50782 [establishing the Mobilehome Park Purchase Fund].) The state clearly has an interest in mobilehome park conversions, but is willing to have local governments occupy some role in the process. The extent of local involvement is calibrated to the situation. However, when the subject is narrowed to conversions that merely affect the change from rental to residential ownership, local involvement is strictly limited. If the proposed conversion has the support of two-thirds or more of the park tenants, section 66428.1 prevents the city or county from interfering except in four very specific situations. If the tenant support is less than two-thirds, section 66427.5 directs that the role of local government "shall be limited to the issue of compliance with this section." (§ 66427.5, subd. (e).)

In sum, the fact that the situations where localities could involve themselves in conversions have been so carefully delineated shows that the Legislature viewed the subject as one where the state concern would not be advanced if parochial interests were allowed to intrude. Accordingly, we conclude that the second and third tests for implied preemption are present.

There is more. "Local legislation in conflict with general law is void. Conflicts exist if the ordinance duplicates . . . general law . . . ." (*Lancaster v. Municipal Court* (1972) 6 Cal.3d 805, 807–808 [100 Cal.Rptr. 609, 494 P.2d 681], citations omitted; accord, *Big Creek, supra,* 38 Cal.4th 1139, 1150; *Morehart v. County of Santa Barbara, supra,* 7 Cal.4th 725, 747.) The Ordinance is plainly duplicative of section 66427.5 in several respects, as the County candidly admits: the Ordinance "sets forth minimum . . . requirements" for the conversion application, "including: (a) submission of a survey of resident support *in compliance with section 66427.5;* (b) submission of a

report on the impact of the proposed conversion on park residents *as required by section 66427.5*; and (c) submission of a copy of the annual maintenance inspection report *already required by Title 25 of the California Code of Regulations.*" (Italics added.) The Ordinance also purports to require the subdivider to provide residents of the park "written notice of [the] right to continue residency as a tenant in the park as required by Government Code Section 66427.5(a)" and "a copy of the impact report required by Government Code Section 66427.5(b)." (Sonoma County Code, § 25-39.7(d), subds. (3), (1).)

And still more. A local ordinance is impliedly preempted if it mandates what state law forbids. (*Big Creek, supra,* 38 Cal.4th 1139, 1161; *Great Western Shows, Inc. v. County of Los Angeles, supra,* 27 Cal.4th 853, 866.) As already established, section 66427.5 strictly prohibits localities from deviating from the state-mandated criteria for approving a mobilehome park conversion application. Yet the Ordinance directs that the application shall be approved "only if the decision maker finds that," in addition to satisfying the survey and tenant impact report requirements imposed by section 66427.5, the application (1) "is consistent with the general plan" and other local land and zoning use regulations; (2) demonstrates that "appropriate" financial provision has been made to underwrite and "ensure proper long-term management and maintenance of all common facilities and infrastructure"; (3) the applicant shows that there are "no conditions existing in the mobile home park that are detrimental to public health or safety"; and (4) the proposed conversion "is a bona-fide resident conversion" as measured against the percentage-based presumptions established by the Ordinance.[14] (Sonoma County Code, § 25.39-7(c), subds. (1)(c)–(f), (2).) The Ordinance also requires that, following approval of the conversion application, the subdivider "shall give each resident household written notice of its exclusive right to contract for the purchase of the dwelling unit or space it occupies at the same or more favorable terms and conditions than those on which such unit or space shall be initially offered to the general public," for a period of 90 days "from the issuance of the subdivision public report . . . pursuant to California Business and Professions Code Section 11018.2." (*Id.,* § 25-39.7(d), subd. (2).)

However commendable or well intentioned these additions may be, they are improper additions to the exclusive statutory requirements of section 66427.5. The matter of just what constitutes a "bona fide conversion"

---

[14] Although it is not discussed in the briefs, a recent decision by Division Three of this district suggests these provisions might also be vulnerable to the claim that they amount to a burden of proof presumption that would be preempted by Evidence Code section 500. (See *Rental Housing Assn. of Northern Alameda County v. City of Oakland* (2009) 171 Cal.App.4th 741, 751, fn. 5, 754–758 [90 Cal.Rptr.3d 181].)

according to the Ordinance appears to authorize—if not actually invite—a purely subjective inquiry, one which is not truly reduced by reference to the Ordinance's presumptions.[15] And although the Ordinance employs the mandatory "shall," it does not establish whether the presumptions are conclusive or merely rebuttable. This uncertainty is only compounded when other criteria are scrutinized. What is the financial provision that will be deemed "appropriate" to "ensure proper long-term management and maintenance"? Such imprecision stands in stark contrast with the clear directives in section 66427.5.

The County, ably supported by an impressive array of amici curiae, stoutly defends its corner with a number of arguments as to why the Ordinance should be allowed to operate. The County lays particular emphasis on the need for ensuring that the conversion must comport with the general plan, especially its housing element, because that is where the economic dislocation will be manifest, by reducing the inventory of low-cost housing. (See Health & Saf. Code, § 50780, subd. (a)(1), (3).) In this sense, however, section 66427.5 has a broader reach than the County perhaps appreciates, as it does make provision in subdivision (f) for helping nonpurchasing lower income households to remain. In any event, we cannot read section 66427.5 as granting localities the same powers expressly enumerated in section 66427.4 that are so conspicuously absent from the plain language of section 66427.5.

■■■ We assume the County was motivated by the laudable purposes stated in the first section of the Ordinance. And we have acknowledged that the County's construction of section 66427.5 can find some plausibility from the statutory language. Nevertheless, and after a most careful consideration of the arguments presented, we have concluded that the Ordinance crosses the line established by the Legislature as marking territory reserved for the state. As we recently stated in a different statutory context: "There are weighty arguments and worthy goals arrayed on each side . . . [and] . . . issues of high public policy. To choose between them, or to strike a balance between them, is the essential function of the Legislature, not a court." (*State Building & Construction Trades Council of California v. Duncan* (2008) 162 Cal.App.4th 289, 324 [76 Cal.Rptr.3d 507].) Of course, if the Legislature disagrees with our conclusion, or if it wishes to grant cities and counties a greater measure of power, it can amend the language of section 66427.5.

---

[15] That uncertainty may be illustrated by how Sequoia perceives one part of the Ordinance. With respect to instances where tenant support for conversion is between 20 percent and 50 percent, the Ordinance provides: "In such cases, the subdivider shall demonstrate, at a minimum, that a viable plan, with a reasonable likelihood of success . . . is in place to convey the majority of the lots to current residents of the park within a reasonable period of time." (Sonoma County Code, § 25-39.7(c), subd. (2)(b).) Sequoia treats this as a requirement that the subdivider come forth with "financial assistance" to assist tenants to purchase their units.

## DISPOSITION

The order is reversed, and the cause is remanded to the trial court with directions to enter a new order or judgment consistent with this opinion. Sequoia shall recover its costs.

Haerle, Acting P. J., and Lambden, J., concurred.

A petition for a rehearing was denied September 10, 2009, and respondent's petition for review by the Supreme Court was denied December 2, 2009, S176718.