Filed 6/13/14 (unmodified opinion attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| 218 PROPERTIES, LLC, et al.,<br><br>        Plaintiffs and Respondents,<br><br>        v.<br><br>CITY OF CARSON et al.,<br><br>        Defendants and Appellants. | B241969<br><br>(Los Angeles County<br> Super. Ct. Nos. BS131337<br> & BS131374)<br><br>ORDER MODIFYING OPINION AND<br>DENYING PETITIONS FOR REHEARING<br>[There is no change in judgment] |

GOOD CAUSE appearing, the opinion filed May 14, 2014, in the above-entitled matter is hereby modified as follows:

1.      On page 4, delete the second sentence in the first full paragraph that begins with "The survey stated the 20 residents . . . ." And replace it with "The survey stated the 20 residents were not interested in buying their plots 'at this moment nor in the near future'."

2.      On page 16, delete the last two sentences of the second paragraph that begins with "In November 2009, . . ." and replace it with "In November 2009, Carson city staff deemed Imperial Avalon's application to be complete, a finding adopted by the planning commission. The planning commission found that Imperial Avalon has "complied with [Government Code section] 66427.5 with respect to submitting a Tenant Impact Report which adequately meets the requirements to consider the impact of the proposed conversion upon the residents of the park.""

3.  On page 17, first paragraph, delete the first sentence that begins with "Imperial Avalon's petition . . ." and replace it with "Imperial Avalon's petition to the trial court argued that Carson's city council could not declare the TIR incomplete after Carson's city staff and planning commission had deemed it complete.

4.  On page 17, delete the second paragraph that begins with "The trial court correctly granted . . . ." and replace it with "The trial court correctly granted relief to Imperial Avalon on the points Imperial Avalon urged. The Carson city staff found the application was complete, a finding the planning commission adopted. Because the TIR's purpose is to inform residents of mobilehome parks and local decision makers, the trial court correctly noted that "completeness and compliance [with the statutory obligation to submit a TIR] are one and the same." Carson's review of the TIR is limited to confirming whether the report complies with section 66427.5. (See § 66427.5, subd. (e) [hearing limited to determining compliance with statute].) Thus, if Carson, through its city staff and planning commission, found the TIR was complete, Carson cannot later, through its city council, reject the TIR on the ground its purported "incompleteness" meant it did not comply with the statute requiring a TIR. (Chino MHC, supra, 210 Cal.App.4th at pp. 1054, 1077 ["once a public agency has accepted an application as complete, it cannot deny the application on the ground that it is incomplete"].)

[end of modifications]

There is no change in judgment.

The petition filed by Appellants is denied.

The petition filed by Respondent is denied.

_____

BIGELOW, P. J.                    RUBIN, J.                    FLIER, J.

Filed 5/14/14 (unmodified version)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| 218 PROPERTIES, LLC, et al. | B241969 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. Nos. BS131337 & BS131374) |
| v. | |
| CITY OF CARSON et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. James C. Chalfant, Judge.  Reversed in part, affirmed in part.

Aleshire & Wynder, William W. Wynder, Sunny K. Soltani and Jeff M. Malwy, for Defendants and Appellants, City of Carson and City of Carson City Council.

Gilchrist & Rutter, Richard H. Close, Thomas W. Casparian and Yen N. Hope, for Plaintiff and Respondent Imperial Avalon Mobile Estates, LLC.

Law Offices of Douglas W. Beck & Associates and Douglas W. Beck for Plaintiff and Respondent 218 Properties, LLC.

_____

The City of Carson and its city council appeal from the trial court's judgment directing Carson to approve the mobilehome conversion applications of 218 Properties, LLC and Imperial Avalon Mobile Estates, LLC. We reverse the trial court in part and direct it to enter judgment affirming Carson's disapproval of the application for conversion by 218 Properties, LLC. We affirm, however, the trial court's judgment to the extent it directs Carson to approve the application for conversion by Imperial Avalon Mobile Estates, LLC.

## FACTS AND PROCEEDINGS

1. *Background*[1]

Traditionally, mobilehome park residents have owned the mobilehome coaches in which they lived, but did not own the plots of land that their coaches occupied. To encourage ownership of plots by residents, the Subdivision Map Act (Gov. Code, § 66410 et seq.)[2] at section 66427.5 provides a method by which a mobilehome park owner can convert the park from a community occupied by tenants who rent their plots into a community akin to a condominium association, in which residents own their plots.

Converting a mobilehome park into a resident-owned community affects rent control. Upon the park owner's very first sale of a plot, all residents lose the protection of local rent control regardless of whether the owner sells any more plots. (*El Dorado Palm Springs, Ltd. v. City of Palm Springs* (2002) 96 Cal.App.4th 1153, 1164-1165 (*El Dorado*).) For lower-income residents, state rent control law instead takes effect. (§ 66427.5, subd. (f)(2).) For all other residents, rent control disappears entirely. (§ 66427.5, subd. (f)(1).) Because a mobile park owner can escape local rent control by selling just one plot, an unscrupulous park owner can abuse the conversion process by

---

[1]     The trial court ruled the writ proceedings involving the applications of 218 Properties and Imperial Avalon were related matters. Accordingly, we consider their appeals together.

[2]     All future undesignated statutory references are to the Government Code.

4

pursuing a "sham" conversion without intending to convert the park into a wholly resident-owned community. To prevent sham conversions, the Legislature in 2002 added a tenant-survey requirement to the mobilehome park conversion statute. (*Chino MHC, LP v. City of Chino* (2012) 210 Cal.App.4th 1049, 1066 (*Chino MHC*); *Colony Cove Properties, LLC v. City of Carson* (2010) 187 Cal.App.4th 1487, 1501-1502 (*Colony Cove*).) The survey requirement, codified at subdivision (d) of section 66427.5, directs the local agency with authority to approve the conversion to "consider" the survey's results as part of the agency's review of the proposed conversion. Courts have wrestled with the meaning of the word "consider" in trying to apply the survey requirement to proposed conversions. We discuss later in this opinion how different courts have answered that question.

*2.    218 Properties, LLC*

218 Properties, LLC owned Park Granada Trailer Lodge, a 26-plot mobilehome park in Carson. 218 Properties owns five of the plots. In 2009, 218 Properties submitted to the City of Carson its application to convert Park Granada Trailer Lodge into a resident-owned park. In March 2010, the Carson planning commission approved the application. The Carson city manager thereafter appealed the planning commission's approval to the Carson City Council.

In May 2010, the city council heard Carson's appeal. The owner of 218 Properties, Thomas Heinemann, submitted his declaration in support of conversion. He declared that he had bought the mobilehome park as an investment to support his retirement, but the park generated a negative cash flow; consequently, he wanted to sell off the park's plots to generate income. To ensure the conversion was bona fide, he was willing to agree to the following conditions: First, he promised a 15 percent discount on the sales price to park residents who bought their plots within the first 180 days of the conversion's approval. Second, he promised to abide by rent control until he sold 20 percent of the plots. And third, he promised to require all future new residents of the

park to buy their plots when moving into the park, thereby ensuring the entire park would eventually become fully resident owned.

In opposition to the conversion, the residents of the mobilehome park submitted a survey signed by 20 residents. The survey stated the 20 residents were not interested in buying their plots anytime in the foreseeable future.[3] Carson's city attorney advised the city council that the council could grant the city's appeal, and thus disapprove the conversion, if the city council concluded the residents' survey raised questions about the proposed conversion's bona fides.[4] Concluding the promised inducements of 218 Properties' owner, Thomas Heinemann, to encourage residents to buy their plots were illusory for several reasons, the city council disapproved the conversion based on the lack of resident support. First, according to the city council, the benefit of Heinemann's promise to early buyers of a 15 percent discount on each plot's sales price could not be calculated because the plots' values were yet to be appraised. Second, Heinemann had not identified the appraiser. And third, Heinemann offered no evidence that any residents were non-low-income tenants who would benefit from his promise to continue rent control past the sale of the first plot. Accordingly, the record indicated in the city council's assessment that 218 Properties did not expect to produce a change in the estate interest of a significant percentage of the mobilehome park residents. Thus, the conversion was not bona fide.

218 Properties filed in the trial court a petition for writ of mandate. Rejecting Carson's reasons for disapproving the conversion, the trial court found Heinemann's declaration was substantial evidence that the conversion was bona fide as a matter of law.

---

**3** An earlier survey to which six residents responded is in the record. Five of those residents opposed the conversion, and one did not state an opinion. Because of technical flaws in this earlier survey, however, 218 Properties accepted as constituting the statutorily required survey the second survey showing no support among the 20 residents.

**4** The city attorney based his advice on this division's unpublished decision in *Carson Harbor Village, Ltd. v. City of Carson* ((Mar. 30, 2010, B211777) [nonpub. opn.]) and argued it was binding precedent.

6

The court noted that likely all of 218 Properties' tenants were low income, meaning rent control remained in place even after 218 Properties began selling plots under the conversion; hence, 218 Properties could not use the conversion to escape rent control if that were 218 Properties' intention for converting. The court further found that Carson could not rely solely on the resident survey to find the conversion was not bona fide because residents may not veto a conversion. (See *El Dorado, supra,* 96 Cal.App.4th at p. 1182; *Colony Cove, supra,* 187 Cal.App.4th at p. 1507; *Chino MHC, supra,* 210 Cal.App.4th at p. 1066 ["The law is not intended to allow park residents to block a request to subdivide."].) The court held, "[t]he conversion is bona fide, and the finding to the contrary is not supported by substantial evidence." The trial court entered judgment directing Carson to approve the conversion. Carson appeals from the court's judgment.

*3.      Imperial Avalon Mobile Estates, LLC*

Imperial Avalon owns a 225-unit mobilehome park in Carson. In 2009, Imperial Avalon submitted its application to the City of Carson for approval to convert the mobilehome park to resident-owned. The Carson planning commission approved the conversion.

The Carson city manager appealed the planning commission's approval to the Carson City Council. In May 2010 the city council heard Carson's appeal. The city council reviewed the residents' survey of support to which 83 residents had responded. Only 18 residents supported the conversion. Based on the lack of resident support, the city council concluded Imperial Avalon's planned conversion was not bona fide because Imperial Avalon did not expect to change the estate interest of a significant percentage of the residents. The city council therefore granted Carson's appeal, and disapproved the conversion.

Imperial Avalon filed in the trial court a petition for writ of mandate to direct Carson to approve the conversion. The trial court found Carson erred in rejecting Imperial Avalon's incentives to encourage the residents to buy their plots: allowing rent control to remain in effect until 20 percent of the plots were sold; requiring new residents

7

to buy their plots; and, offering a 15 percent discount to residents who buy within the first 90 days, and a 10 percent discount to those who buy within the second 90 days. The court held the residents' opposition could not veto the conversion, and Carson could not rely solely on the survey to find the conversion was not bona fide. The court stated "The conversion is bona fide, and the finding to the contrary is not supported by substantial evidence." The court thus entered judgment for Imperial Avalon directing Carson to approve the conversion. This appeal followed.

## STANDARD OF REVIEW

We review for substantial evidence Carson's disapproval of Imperial Avalon's and 218 Properties' applications. We do not review, nor are we bound by, the trial court's factual findings or legal conclusions. "The scope of our review of the subject administrative agency action in this case is identical with that of the superior court. The same substantial evidence standard applies, and the issue is whether the findings of [Carson] were based on substantial evidence in light of the entire administrative record. [Citations.] . . . [W]e must examine the findings made by [Carson] itself to determine whether they were supported by substantial evidence, rather than limiting ourselves to a review of the findings made by the trial court. [Citations.] (*Desmond v. County of Contra Costa* (1993) 21 Cal.App.4th 330, 334-335; see also *American Canyon Community United for Responsible Growth v. City of American Canyon* (2006) 145 Cal.App.4th 1062, 1070.)

## DISCUSSION

1.    *Substantially Different Survey Results Require Different Outcomes*

As previously noted, section 66427.5 governs conversion of mobilehome parks into resident-owned communities. As part of a conversion, section 66427.5, subdivision (d) requires a resident survey. At the time Imperial Avalon and 218 Properties submitted their applications for conversion, section 66427.5 subdivision (d)

8

provided: "(1) The [mobile park owner] shall obtain a survey of support of residents of the mobilehome park for the proposed conversion. [¶] . . . [¶] (5) The results of the survey shall be submitted to the local agency upon the filing of the tentative or parcel map, to be considered as part of the subdivision map hearing . . . ."[5] The Legislature adopted the survey requirement from its concern that park owners might use conversion as a subterfuge for purposes other than bona fide conversions. In an uncodified statement of legislative intent, the Legislature explained: "It is the intent of the Legislature to address the conversion of a mobilehome park to resident ownership that is not a bona fide resident conversion, as described by the Court of Appeal in *El Dorado*[, *supra*,] 96 Cal.App.4th 1153. The court in this case concluded that the subdivision map approval process specified in Section 66427.5 of the Government Code may not provide local agencies with the authority to prevent nonbona fide resident conversions. The court explained how a conversion of a mobilehome park to resident ownership could occur without the support of the residents and result in economic displacement. It is, therefore, the intent of the Legislature in enacting this act [requiring a resident survey] to ensure that conversions pursuant to Section 66427.5 of the Government Code are bona fide resident conversions." (See Historical and Statutory Notes, 36E West's Ann. Gov. Code (2009 ed.) foll. § 66427.5, p. 47.)

Local agencies and courts have wrestled with the meaning of the statutory duty to "consider" the tenant survey, and how that consideration should affect the analysis of whether a conversion is bona fide. Complicating the analysis is subdivision (e) of section 66427.5, which, in seeming contradiction of the duty to "consider" the survey, purportedly restricts the local agency's review of the application solely to determining whether the mobile park owner complied with each step of the conversion statute's procedures. Subdivision (e) states: The park owner "shall be subject to a hearing . . . to approve, conditionally approve, or disapprove [the conversion]. The scope of the hearing shall be limited to the issue of compliance with this section." (See e.g. *Goldstone v.*

---

[5]     The Legislature has since amended subdivision (d). We discuss the amendment, which took effect on January 1, 2014, *post*.

9

*County of Santa Cruz* (2012) 207 Cal.App.4th 1038, 1045 (*Goldstone*) [noting "seemingly conflicting directives laid out in" subdivisions (d) and (e)].)

The Carson City Council concluded based on the resident surveys that the conversions were not bona fide and thus disapproved the conversions. Relying on subdivision (e), Imperial Avalon and 218 Properties assert that Carson erred in disapproving the conversions. In support, Imperial Avalon and 218 Properties cite *Sequoia Park Associates v. County of Sonoma* (2009) 176 Cal.App.4th 1270, which noted: " 'The [mobile park owner] shall be subject to a hearing by a legislative body or advisory agency, which is authorized by local ordinance to approve, conditionally approve, or disapprove the [conversion]. *The scope of the hearing shall be limited to the issue of compliance with this section.*' " (*Id*. at p. 1293, italics in original.)

Since *Sequoia Park Associates*, other appellate courts addressing the conflict between subdivisions (d) and (e) have gone the other way. Those courts have concluded the better view is to allow the local agency to rely on the survey's results to determine whether the conversion is bona fide. The thrust of the analysis by these courts asks for what purpose does the survey exist if not to gauge the interest of residents in buying their plots, and thus to assess the likelihood of the conversion's success. We agree with these post-*Sequoia Park* decisions. Taking a survey's results into account is more in keeping with section 66427.5's overall intent than does the contention of Imperial Avalon and 218 Properties that the survey is a mere ministerial task to be checked-off a list of pro forma steps in a conversion. (See *Goldstone, supra,* 207 Cal.App.4th at p. 1054 [considering results of survey "does less violence to the statute than construing" the survey requirement as ministerial surplusage].)[6] These latter cases, which held the survey's results must be taken into account in order to avoid rendering the survey language meaningless, are:

---

[6]    218 Properties suggests a trial court, but not the local agency, may entertain the survey's results, not just the fact of it having been duly performed, if residents mount a post-conversion legal challenge to a conversion that in retrospect appears to be a sham. 218 Properties cites no authority, however, for its suggestion, and *Chino MHC, LP v. City of Chino*, *supra*, 210 Cal.App.4th at page 1069, rejected a similar suggestion.

10

● *Colony Cove, supra,* 187 Cal.App.4th at pages 1505 to 1506, which stated:

"[The mobile park owner] urges that we follow the example of *Sequoia Park* . . . . That construction would . . . preclude the City from considering the contents of the survey of support during the . . . hearing process and limit it to purely ministerial duties—determining whether the survey had been prepared and filed in accordance with section 66427.5 . . . [¶] When the Legislature amended [] section 66427.5 in 2002, it did not change the language now contained in subdivision (e), which continues to state that 'the scope of the . . . hearing shall be limited to the issue of compliance with this section.' However, the phrase 'limited to the issue of compliance with this section' must be interpreted in light of the new language of the preceding subdivision (d). That subdivision requires applicants to obtain a survey of support of the residents of the mobilehome park . . . and to submit '[t]he results' to the entity or agency 'authorized by local ordinance to approve, conditionally approve, or disapprove the [subdivision] map.' This language alone suggests that the contents of the survey, as opposed to its mere existence, are relevant to the approval process. By thereafter specifically stating that the results are 'to be considered as part of the subdivision map hearing prescribed by subdivision (e),' the Legislature made that intention explicit. Construing the statute to eliminate the power of local entities and agencies to consider the results of the survey when processing a conversion application would consign the 'to be considered' language of subdivision (d)(5) to surplusage."

● *Goldstone*, *supra*, 207 Cal.App.4th at page 1054:

*Goldstone* held the local agency may consider the survey's results, not just whether the survey was conducted in compliance with the conversion statute's procedures. And although the conversion statute leaves unsettled what the local agency is to make of the results, the local agency may not set a minimum percentage of support requirements. The *Goldstone* court explained:

"Subdivision (d)(5) requires that the owner submit the 'results' of the survey to the local agency. If, as [the mobile park owner] contends, the scope of the hearing is strictly limited to the question of the owner's 'compliance' with the statute per section 66427.5,

11

subdivision (e), why bother submitting the 'results' of the survey to the local agency, rather than mere proof of compliance with section 66427.5? If [the mobile park owner's] interpretation is correct, the survey's results are irrelevant, at least as far as the local agency is concerned, so why specify that they be submitted? If the Legislature simply wanted the hearing to be about compliance with the statute, it could have directed that the [mobile park owner] submit just the survey form, along with sufficient proof of compliance with section 66427.5's other directives. [¶] The remainder of section 66427.5, subdivision (d)(5) tells us what the Legislature intended the local agency to do with those results—it intended that they are 'to be considered as part of the subdivision map hearing required by subdivision (e).' 'Consider,' as a transitive verb, is defined as follows: '1: to think about carefully: as a: to think of esp. with regard to taking some action . . . . b: to take into account . . . 2: to regard or treat in an attentive or kindly way . . . 3: to gaze on steadily or reflectively 4: to come to judge or classify . . . 5: regard . . . 6: suppose.' (Merriam–Webster's Collegiate Dict. (10th ed.1999) p. 246.) As an intransitive verb, 'consider' is defined as 'reflect, deliberate.' (*Ibid.*) Accordingly, the plain meaning of subdivision (d)(5) directs the local entity or agency to 'think about carefully' or 'deliberate' upon the results of the resident survey as part of the hearing. If the Legislature intended the local entity or agency to tick boxes on a compliance checklist and rubberstamp all applications where the appropriate boxes were marked, it would not have directed the [mobile park owner] to submit the results of the resident survey, nor would it have directed that those results 'be considered' as part of the hearing."

● *Chino MHC, supra,* 210 Cal.App.4th at pages 1068-1069:

*Chino MHC* held a local agency may rely on the survey to find the conversion is a sham, but it may not make that finding based solely on a lack of majority support among the residents for the conversion. The court explained:

"The Legislature considered allowing a local agency to impose conditions of approval but ultimately it rejected this approach. It also considered requiring the sale of a threshold number of lots, but it rejected this approach, too. It had before it a suggestion that it should require a specified minimum level of resident support, but it did not adopt

12

it. Instead, the Legislature chose to require a survey of support. [¶] The reason for requiring a survey was 'to ensure that the conversion is not a sham conversion . . . .' [Citation.] The survey would enable 'local agencies to determine whether the conversion is truly intended for resident ownership, or if it is an attempt to preempt a local rent control ordinance.' [Citation.] However, the survey requirement was not intended to enable park residents to block a conversion—not even when a majority of park residents are opposed to the conversion. [¶] We therefore conclude that a local agency *is* entitled to deny a conversion application based on the survey results. However, it may do so only if the survey results show that the conversion is a sham. Only then can it be said that the subdivider, even though it has obtained a survey, has not 'compli[ed]' with section 66427.5. The mere fact that a majority of residents are opposed to the conversion falls short of showing that the conversion is a sham. And the mere fact that the subdivider subjectively intends to obtain immunity from rent control also falls short. Section 66427.5 contemplates that a subdivider may be at least partly motivated by the prospect of avoiding rent control, as it intentionally provides such immunity. Thus, a sham conversion is one that is *merely* intended to avoid rent control and *not* to transfer ownership to residents. [Citation.]"

Finding that the statutory duty to "consider" the survey was unclear, some courts have asked the Legislature for clarification. For example, the *Colony Cove* court noted "We recognize that our conclusion—that section 66427.5 permits consideration of the results of the survey of support but not the promulgation of an ordinance requiring specific levels of resident support—does not resolve the manner in which the City and other local agencies are to approach conversion applications. The uncertainty derives from the statute itself, which requires local agencies to consider resident survey results but provides no guidance as to how the results may be used. It is our hope that the Legislature will recognize the dilemma faced by local agencies . . . and act to clarify the scope of their authority and responsibilities." (*Colony Cove, supra,* 187 Cal.App.4th at p. 1508, fn. 18.) And in *Goldstone*, the court stated: "Like *Colony Cove*, we acknowledge that our holding in this case does not provide much, if any, guidance to

13

local agencies or entities about how to manage mobilehome conversion applications. [Citation.] Though they are precluded, under *Sequoia Park . . .* from promulgating ordinances requiring specified levels of resident support, section 66427.5, subdivision (d)(5) instructs them to consider the results of the resident support surveys in passing on conversion applications, but offers no direction on the appropriate use of those results. We think everyone concerned, from mobilehome park owners to mobilehome residents to the local agencies and entities, would benefit from such instruction, as it would make the conversion application process more transparent and less uncertain. That, however, is a task for the Legislature, not the courts."

Perhaps hearing the pleas of various courts, the Legislature has returned several times to the survey requirement. The most recent was Senate Bill No. 510, which took effect on January 1, 2014. The bill amended subdivision (d) to permit a local agency to disapprove an application for conversion based solely on the lack of majority support for conversion among the residents. The amended language of subdivision (d) states (the amended language is italicized): "(5) The results of the survey shall be submitted to the local agency . . . to be considered in the agency's decision as to whether to approve, conditionally approve, or disapprove the map, *and the agency may disapprove the map if it finds that the results of the survey have not demonstrated the support of at least a majority of the park's homeowners. [¶] (6) Local legislative bodies may, by ordinance or resolution, implement the requirements of this subdivision.*"[7] (Stats. 2013, ch. 373.)

---

[7] Carson urges that we apply the amended language under the principle of adhering to existing law when we render our decision. In support, Carson cites *City of Watsonville v. State Dept. of Health Services* (2005) 133 Cal.App.4th 875. There, the city of Watsonville was about to begin fluoridating the city water supply as required by state law, but city voters adopted an ordinance barring the city from doing so. (*Id.* at p. 881.) The city filed a complaint for declaratory and injunctive relief on the question of whether the state fluoridation law preempted the city ordinance. (*Id.* at p. 882.) The trial court found implied preemption, and the city appealed. While the appeal was pending, the state legislature enacted an explicit statement of state preemption for the fluoridation program. (*Id.* at p. 884.) Following the legislature's express statement of preemption, the city argued to the Court of Appeal that the court should disregard the new legislation because the appellate court should apply the law as it existed when the trial court entered

14

Thus, had the present conversion applications been filed in 2014, in all likelihood Carson could have relied on newly-amended subdivision (d) to disapprove the applications, and the posture of 218 Properties and Imperial Avalon on appeal would be much weaker. But we review not some hypothetical applications. Instead, we review the correctness of Carson's disapproval of the conversions at the time Carson made its decisions. Because Senate Bill No. 510 had not been passed when Carson disapproved the applications in 2010, that legislation is not a basis for upholding Carson's decisions. Nevertheless, Senate Bill No. 510 is instructive on what the Legislature may have envisioned all along about the survey's proper use because Senate Bill No. 510 reflects the thinking of Legislators who have contemplated the matter, presumably considering the value and practicalities of the survey in mobilehome park conversions.

Here, Carson relied on the lack of residents' support to disapprove both conversions. Survey results help illuminate a conversion's bona fides because a conversion is not likely to succeed if the residents adamantly oppose it. (See *Chino MHC*, *supra*, 210 Cal.App.4th at pp. 1073-1074 [agreeing with *Goldstone* that "near unanimous" opposition with only 2 residents supporting conversion out of 147 residents was sufficient to disapprove conversion].) At the same time, however, we may not give the residents' expression of disapproval veto power over the conversion. (See *Chino MHC* at p. 1065, *Colony Cove, supra,* 187 Cal.App.4th at p. 1507 & fn. 18.) For 218

judgment. (Although the trial court had ruled against the city, the law of *implied* preemption on which the trial court had seemingly based its judgment was less unfavorable to the city, and thus gave the city at least a glimmer of hope on appeal, than the new *express* preemption, which largely extinguished any hope the city had for a successful appeal.) The *Watsonville* appellate court concluded that, contrary to the general rule that an appellate court reviews the correctness of a trial court's judgment at the time the judgment was rendered, it would apply the new legislation stating express preemption. The *Watsonville* court reasoned that the injunctive and declaratory relief under review were prospective because such relief regulated the parties' rights going forward, and therefore the relief should conform to then-existing law. (*Id.* at pp. 884-885.) The *Watsonville* court's reasoning makes *Watsonville* distinguishable. Here, we are asked to adjudicate the legality of Carson's *past* actions in 2010 disapproving the mobile home park conversions.

15

Properties, 20 residents responded to the survey from among 26 plots (five of which 218 Properties owned); all 20 residents opposed the conversion. For Imperial Avalon's more than 200 residents, however, only 82 residents responded to the survey, of whom 46 opposed the conversion, 18 supported it, and 18 did not state an opinion. In face of resident opposition – for 218 Properties nearly, if not entirely, unanimous; for Imperial Avalon much more muted – one must look to the park owners' evidence that the conversions might succeed. Here, Carson concluded that evidence fell short. For us as an appellate court reviewing the administrative record, we must affirm Carson's decisions unless the evidence against Carson's decisions is so overwhelming that it can be said that no substantial evidence supports them. (*Committee to Save the Hollywoodland Specific Plan v. City of Los Angeles* (2008) 161 Cal.App.4th 1168, 1182.)

The declaration from Imperial's President Edward Jong showed that a gradual purchase of lots would enable the residents to own a majority of the park within a reasonable time, and that the park eventually and inevitably would be entirely resident-owned. Gradual sales would give Imperial steady income, and would be more profitable to Imperial than selling the entire park in one transaction. Jong anticipated selling a significant number of lots in the first year or two, and would encourage such sales by offering discounted prices from appraised values to current residents. Jong expected to sell 25 to 35 percent of the park's lots to current residents in the first 180 days. Further, Jong agreed that Carson's rent control ordinance would remain in effect for non-low income households until 20 percent of the park's lots were sold. Jong also agreed that all new purchasers of mobilehome units in the park would be required to purchase the underlying lot. As attrition occurred through the sale of existing mobilehome units, this would ensure that rental lots would be phased out over time, with the park majority owned by residents as sales occurred, and eventually becoming 100 percent owned by residents.

The only evidence against Imperial's bona fide intent to alienate the lots in its park is the survey of residents. There are 225 spaces or resident households in Imperial's park. Of the 225 households in Imperial's park, only 83 returned ballots. Of those, 18

supported conversion, 46 opposed conversion, 3 did not mark their ballots, 15 declined to state their votes, and 1 ballot was returned after the deadline. As in *Chino*, a majority of residents did not care enough about conversion to respond to the survey. This low response was insufficient to show the conversion was a sham.

218 Properties is in a different posture. Thomas Heinemann purchased the park in 2009, and experienced negative cash flow from that time. Heinemann averred that he wanted to sell lots piecemeal to provide cash flow during his retirement. He promised to give current residents who opened escrow within 180 days after conversion a 15 percent discount off the fair market value price. Both sides of the case agreed in the trial court that "possibly 100 [percent]" of the park's residents are low income, and will be subject to continuing rent control under section 66427.5 subdivision (f), even after conversion begins. Also, Heinemann agreed that Carson's rent control ordinance would continue to protect residents who were not low income until 20 percent of the lots in the park were sold. Heinemann also agreed that the governing documents of the park would require new residents to purchase the underlying lot at the same time as purchasing a trailer unit in the park. Thus, over time, all lots in the park would become resident-owned.

The numerical results of the resident survey in 218 Properties differed sufficiently from the numerical results in Imperial Avalon to rise to a difference in kind. The survey in 218 Properties consisted of a letter signed by 20 individual residents living in the 26 spaces in the park. Of those 26 spaces, 5 are owned by 218 properties, meaning 20 out of 21 possible residents responded. Those 20 stated they were not interested in purchasing their lots "at this moment or in the near future." In the face of unanimous opposition to the conversion among 20 out of 20 (or perhaps 21) residents of 218 Properties, Carson's conclusion that the conversion was not bona fide is not beyond the pale because those 20 residents are, after all, the most likely target of future sales. We may reverse Carson's disapproval of the conversion only if we conclude the evidence showing the conversion is bona fide is sufficiently overwhelming to establish that the conversion is bona fide as a matter of law. Only in the absence of any substantial evidence to support Carson's decision may we (or the trial court) reverse Carson's decision. Because we cannot say

17

that evidence submitted by 218 Properties that its conversion will change its mobilehome park into fully resident-owned facilities is overwhelming, we must reinstate Carson's disapproval of the application for conversion by 218 Properties.

2.    *Imperial Avalon's Tenant Impact Report*

Because we conclude the trial court correctly found that Imperial Avalon's application for conversion was bona fide – and thus Carson improperly disapproved the application – we must address Carson's alternative ground for appellate relief against Imperial Avalon: a purportedly inadequate Tenant Impact Report ("TIR").

Section 66427.5 obligated Imperial Avalon to file a TIR discussing the effect of the conversion on the residents of Imperial Avalon's mobilehome park. The statute states: "At the time of filing a tentative or parcel map for a subdivision to be created from the conversion of a rental mobilehome park to resident ownership, the subdivider shall avoid the economic displacement of all nonpurchasing residents in the following manner: . . . (b) The subdivider shall file a report on the impact of the conversion upon residents of the mobilehome park to be converted to resident owned subdivided interest." In October 2009, Imperial Avalon submitted its TIR as part of its application for conversion. In November 2009, the Carson planning commission deemed Imperial Avalon's application to be complete. The commission found that Imperial Avalon has "complied with [Government Code section] 66427.5 with respect to submitting a Tenant Impact Report which adequately meets the requirements to consider the impact of the proposed conversion upon the residents of the park."

In the appeal by Carson's city manager to the city council following the planning commission's approval of the conversion, the city council concluded Imperial Avalon's TIR was inadequate under section 66427.5. Among other defects the city council identified were the TIR "fails to report on the impact of the conversion upon displaced residents"; was "incomplete" in not addressing "the availability of adequate replacement space in mobilehome parks"; did not discuss the delay in moving from local to state rent control; and did not discuss selection of an appraiser for the lots.

18

Imperial Avalon's petition to the trial court argued that Carson's city council could not deem the TIR incomplete after Carson's planning commission had declared it complete. In addition, according to Imperial Avalon, even if the TIR were incomplete, the city council exceeded its authority by rejecting the TIR without giving Imperial Avalon an opportunity to supplement its TIR with the additional information that the city council thought was missing.

The trial court correctly granted relief to Imperial Avalon on the points Imperial Avalon urged. The Carson planning commission found the application was complete. Because the TIR's purpose is to inform residents of mobilehome parks and local decision makers, the trial court correctly noted that "completeness and compliance [with the statutory obligation to submit a TIR] are one and the same." Carson's review of the TIR is limited to confirming whether the report complies with section 66427.5. (See § 66427.5, subd. (e) [hearing limited to determining compliance with statute].) Thus, if Carson, through its planning commission, found the TIR was complete, Carson cannot later, through its city council, reject the TIR on the ground its purported "incompleteness" meant it did not comply with the statute requiring a TIR. (*Chino MHC*, *supra*, 210 Cal.App.4th at pp. 1054, 1077 ["once a public agency has accepted an application as complete, it cannot deny the application on the ground that it is incomplete"].)

Moreover, even if the TIR were incomplete, Carson's city council did not honor Imperial Avalon's implicit statutory right to correct the TIR's purported inadequacies. The trial court found that the city council "did not request Imperial to supplement its TIR, but rather denied the Application because the TIR was insufficient." Under section 65944, subdivision (a), if information in a TIR is incomplete, the local agency may request supplemental information as long as it is not information involving new matters. The statute states: "After a public agency accepts an application as complete, the agency shall not subsequently request of an applicant any new or additional information . . . . The agency may, in the course of processing the application, request the applicant to clarify, amplify, correct, or otherwise supplement the information required for the

19

application." (§ 65944, subd. (a).)  Thus, Section 65944 expressly authorizes a local agency to request a mobilehome park owner to "clarify, amplify, correct, or otherwise supplement" information in the application.  (*Ibid.*)  The agency may not, however, request "any new or additional information" that the agency had not previously identified as needed in the application.  (§§ 65944, subd. (a), 65940, subd. (a).)

Finally, the purported incompleteness of Imperial Avalon's TIR was not cited by Carson's city manager in its notice of appeal to the city council.  Carson's municipal code requires that a notice of appeal to the city council state the grounds for appeal.  Carson Municipal Code section 9173.4, subdivision (B)(3) ("Division 3.  Elements of Procedure: Appeals") states:  "The form and content of an appeal shall include:  [¶] . . . [¶]  c. The specific matter being appealed.  [¶]  d. A statement of the grounds for appeal or how there is error in the decision of the matter being appealed."[8]  But the city manager's notice of appeal stated merely "[t]he basis of the appeal is to review public policy and land use issues and to preserve our rights and options in regards to the pending decision by the Court in the Second Appellate District, Division Eight, in the matter of *Carson Harbor Village, Ltd. v. City of Carson* . . . .  Hence, with this appeal to the City Council, staff's recommendation to the City Council may change depending on the ruling of the Court of Appeals in the CHV case decision."

For the foregoing reasons, we find the trial court did not err in finding Carson wrongfully relied on the purported inadequacy of Imperial Avalon's TIR to disapprove Imperial Avalon's application for conversion of its mobilehome park.

## DISPOSITION

The judgment is affirmed in part and reversed in part.  The trial court is directed to enter a new judgment reversing the City of Carson's disapproval of the application for conversion filed by Imperial Avalon Mobile Estates, LLC, and affirming the City of

---

[8]     http://www.codepublishing.com/ca/carson.html

20

Carson's disapproval of the application for conversion filed by 218 Properties, LLC.
Each party to bear its own costs on appeal.


RUBIN, J.

WE CONCUR:


BIGELOW, P. J.


FLIER, J.

**218 Properties et al. v. City of Carson et al.**

**B241969**

**BIGELOW, P. J., Concurring:**

I concur in the judgment and reasoning of the majority opinion. I write separately to acknowledge that, in a prior case, I expressed the view that that former section 66427.5 of the Government Code[1] — which then governed an application for a subdivision map to be created from the conversion of a rental mobile home park to a resident-owned park — should not be interpreted to give authority to a local agency to deny such an application on the ground that the conversion was not "bona fide" in light of a survey of residents of the park. (See *Carson Harbor Village, Ltd. v. City of Carson* (Mar. 30, 2010, B211777 [nonpub. opn.; dis. opn. by Bigelow, J.] (*Carson Harbor Village*).) The Supreme Court denied review in *Carson Harbor Village* on June 17, 2010 (S182526), and, in the years since, at least two courts of appeal construed former section 66427.5 to give authority to a local agency to deny a conversion based on "consideration" of a survey of residents. (See, e.g., *Chino MHC, LP v. City of Chino* (2012) 210 Cal.App.4th 1049, 1069.) It is fair to say that, whatever my views on the interpretation of former section 66427.5 may have been, that view will no longer carry the day. Here, I am satisfied that the evidence supports a finding that Imperial Avalon is pursuing a bona fide conversion, but does not support a finding that 218 Properties is pursuing a bona fide conversion. Under former section 66427.5, each case must be determined based on its own facts.

All of this is largely an academic exercise in any event. As the majority opinion notes, the Legislature amended former section 66427.5, effective as of January 1, 2014. The section now expressly gives authority to a local agency to base a mobilehome park conversion decision on the results of survey of the residents of the park. (See Stats. 2013,

---

**1**    All further section references are to the Government Code.

1

ch. 373.)  Cases going forward, including all constitutional, statutory, procedural and factual issues, will need to be addressed under the new statute.


BIGELOW, P. J.


2