Filed 1/25/16  Mesa Dunes Mobile Home Estates v. County of San Luis Obispo CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| MESA DUNES MOBILE HOME ESTATES, LLC,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>COUNTY OF SAN LUIS OBISPO et al.,<br><br>    Defendants and Respondents. | 2d Civil No. B259229<br>(Super. Ct. No. 14CV0219)<br>(San Luis Obispo County) |

Before a mobilehome park owner may subdivide the property to convert it from rental spaces to resident ownership, it must first "obtain a survey of support of residents . . . for the proposed conversion."  (Gov. Code, § 66427.5, subd. (d)(1).)[1]  At issue here, the survey must be "conducted in accordance with an agreement between the subdivider and [the] resident homeowners' association" (HOA).  (*Id.* subd. (d)(2).)

Appellant Mesa Dunes Mobile Home Estates, LLC (Mesa Dunes) believed it had reached such an agreement with the HOA of its mobilehome park (Park).  Accordingly, it went ahead and conducted the survey.  The San Luis Obispo County Department of Planning and Building (Department) deemed the conversion application incomplete due to insufficient evidence that the resident support survey was conducted

---

[1] All further statutory references are to the Government Code unless otherwise stated.

pursuant to the required agreement with the HOA. Respondent San Luis Obispo County Board of Supervisors (Board of Supervisors) affirmed the Department's decision. Mesa Dunes then sought a writ of administrative mandate in the trial court. The trial court denied the petition.

We affirm. Although the parties dispute whether substantial evidence supports the Board of Supervisors' decision, the dispositive issue is a mixed question of law and fact: what does the statute mean by "agreement"? We conclude that it requires the HOA's informed consent. As we shall explain, the HOA here "agreed" to a survey only in the sense that it did not object to the informal and inconsequential polling of Park residents that it understood Mesa Dunes to be proposing. It did not "agree" to a process it did not understand would have long term, legally binding consequences. Therefore, substantial evidence supports the Board's decision to reject Mesa Dunes' application as incomplete. We reject Mesa Dunes' remaining arguments concerning augmentation of the record and judicial notice.

## STATUTORY BACKGROUND

Mobilehome park residents typically own their mobilehomes and rent the spaces on which the homes are placed. (*Hoffman v. Smithwoods RV Park, LLC* (2009) 179 Cal.App.4th 390, 398.) Once placed in a park, mobilehomes are difficult to relocate. (*Greening v. Johnson* (1997) 53 Cal.App.4th 1223, 1226.) Given the unique nature of mobilehome tenancies, "mobilehome park tenants are particularly vulnerable . . . to rent increases." (*People v. Beaumont Inv., Ltd.* (2003) 111 Cal.App.4th 102, 109.) Many local governments therefore impose rent control measures on mobilehome parks. (*Yee v. City of Escondido, Cal.* (1992) 503 U.S. 519, 524.)

The Legislature added section 66427.5 to the Subdivision Map Act to encourage "the conversion of a mobilehome park from a rental to a resident ownership basis." (*Sequoia Park Associates v. County of Sonoma* (2009) 176 Cal.App.4th 1270, 1274.) Section 66427.5 "provides a method by which a mobilehome park owner can convert the park from a community occupied by tenants who rent their plots into a

2

community akin to a condominium association, in which residents own their plots." (*218 Properties, LLC v. City of Carson* (2014) 226 Cal.App.4th 182, 186 (*218 Properties*).)

Conversion, however, affects rent control. San Luis Obispo County generally limits mobilehome rent increases for existing tenants to 60 percent of the cost-of-living increase. (San Luis Obispo Code, § 25.06.010, subd. (b).) As soon as the park owner sells the first plot, "all residents lose the protection of local rent control regardless of whether the owner sells any more plots." (*218 Properties*, *supra*, 226 Cal.App.4th at p. 186.) Lower income residents who choose not to purchase their plots are protected from excessive rent increases.[2] (§ 66427.5, subd. (f)(2).) For all other residents, rent control ends altogether as market rates are phased in over a four-year period. (§ 66427.5, subd. (f)(1).)

Historically, residents initiated the conversion process themselves, often with the help of a nonprofit organization that would buy the entire park and sell lots to individual owners. (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 510 (2013-2014 Reg. Sess.) as amended Aug. 19, 2013, p. 3.) "Because a mobilehome park owner [could] escape local rent control by selling just one plot," however, "unscrupulous park owner[s] [were able to] abuse the conversion process by pursuing a 'sham' conversion without intending to convert the park into a wholly resident-owned community." (*218 Properties*, *supra*, 226 Cal.App.4th at p. 186.)

To prevent sham conversions, the Legislature in 2002 added the requirement of a survey of resident support. "It [was] . . . the intent of the Legislature in enacting this act to ensure that conversions pursuant to Section 66427.5 of the Government Code are bona fide resident conversions." (Stats. 2002, ch. 1143, § 2.) It is one of several steps a mobilehome park owner must take to "avoid economic

---

[2] Monthly rents for lower income residents may not increase by more than "the average monthly increase in rent in the four years immediately preceding the conversion" or "the average monthly percentage increase in the Consumer Price Index for the most recently reported period," whichever is lower. (§ 66427.5, subd. (f)(2).)

displacement of all nonpurchasing residents" (§ 66427.5) before the appropriate local agency can approve its conversion application.

The survey must be conducted by written ballot (§ 66427.5, subd. (d)(3)) pursuant to an agreement with an independent HOA, if any (*id.* subd. (d)(2)), with each occupied mobilehome space receiving one vote (*id.* subd. (d)(4)).  The park owner submits the survey results with its subdivision application, and the local agency "consider[s]" them at a hearing to determine compliance with section 66427.5.  (*Id.* subds. (d)(5), (e).)  A 2014 amendment to the statute clarifies that "the agency may disapprove the [application] if it finds that the results of the survey have not demonstrated the support of at least a majority of the park's homeowners."[3]  (*Id.* subd. (d)(5).)  In addition, "[l]ocal legislative bodies may, by ordinance or resolution, implement the requirements of [the resident support survey]."  (*Id.* subd. (d)(6).)

FACTS AND PROCEDURAL HISTORY

The Park is a manufactured housing community located in an unincorporated area of San Luis Obispo County near Arroyo Grande.  Most of its 299 occupied spaces are rented through long-term agreements, while 36 are subject to rent controlled month-to-month agreements.  Park residents have an HOA governed by a nine-member Board of Directors (HOA Board).

Mesa Dunes informed Park residents by letter that it "plan[ed] to subdivide the Park" in order "to convert the park to a resident owned community."  It explained that "[t]he process of converting a mobilehome park to resident ownership is controlled by

---

[3] The 2014 amendment "is instructive on what the Legislature may have envisioned all along about the survey's proper use."  (*218 Properties*, *supra*, 226 Cal.App.4th at p. 194.)  Prior to the amendment, the local authority could reject a conversion application if the survey revealed sufficient opposition among residents, but the exact threshold of opposition necessary was unclear.  (cf. *Chino MHC, LP v. City of Chino* (2012) 210 Cal.App.4th 1049, 1074 ["[T]he mere fact that a majority of residents oppose a conversion does not show that it is a sham," particularly when "the vast majority of residents simply failed to respond" to the survey], with *Goldstone v. County of Santa Cruz* (2012) 207 Cal.App.4th 1038, 1054 [upholding denial of conversion application where 119 out of 121 survey respondents opposed conversion and up to 26 households did not return surveys].)

4

State laws." It enclosed general information about how conversion would affect residents and a list of protections and incentives it would be offering beyond those required by state law. In addition, it notified residents of "informational" meetings being held the following week.[4] The letter did not mention the survey of resident support.

At the informational meetings, Mesa Dunes' representative Susy Forbath told attendees that they would receive a "survey of residents" in one week. She stated that the survey "doesn't mean anything" and was "just a formality required by state law." She mentioned that she would be meeting with the HOA Board the next day to explain the survey to them. This surprised the HOA Board, which had not yet been contacted about the survey or the meeting and knew nothing of either.[5]

At the end of the informational meeting, Forbath told Sharon McMahan, the HOA Board president, that the HOA Board "was required to meet with her on the very next day . . . if [it] wanted to see the survey form that her firm would be sending out." McMahan objected, telling Forbath that the HOA Board "needed more time to properly call a . . . meeting, to study the issue of conversion, and to obtain legal advice." Forbath insisted on meeting the next day "because she 'did not want to make another trip to Arroyo Grande' and . . . she 'could not wait because the Park owner had to get this part of the conversion process completed immediately.'"

At the meeting the next morning, Forbath distributed sample surveys to the seven HOA Board members present. She told them "that it was an informational survey

---

[4] Residents were "assigned" to one of two scheduled meetings based on their space number.

[5] Forbath disputed this version of events and various statements attributed to her by HOA Board members. She claimed that four days before the informational meeting, after several unsuccessful attempts to reach the HOA Board president (who was out of town at the time), she contacted another HOA Board member, Gerald Schmidt, and set up the meeting with the HOA Board to discuss the survey. Schmidt acknowledged speaking with her but denied that she told him the meeting's purpose was to review a resident support survey. We must defer to the administrative agency's broad discretion to make credibility determinations and resolve conflicting evidence. (*Larson v. State Personnel Bd.* (1994) 28 Cal.App.4th 265, 273.)

to determine if residents were interested in the conversion" and that it "*would* be sent out in six days." She did not disclose that Mesa Dunes was required to obtain an agreement with the HOA Board regarding the content of the survey and the procedures for conducting it. She also did not explain that the Department would consider the survey results when determining whether to approve the conversion application. She stated "that even though [the] results would be reported to the County [it] 'did not have a say in the conversion.'"

One HOA Board member requested an increase in the font size of a disclaimer paragraph at the bottom of both pages because it was too small to be legible by some residents. The disclaimer provided, "By providing the information requested in this survey, you are not committing yourself to any decision with respect to the change in ownership, including, without limitation, whether you want to rent or to purchase if there is a change in the form of ownership of Mesa Dunes Mobilehome Estates." Forbath agreed to make that change. She suggested giving residents ten days to return their surveys, but agreed to the two-week response time that the HOA Board preferred. She also agreed to put a drop box in the Park office so that residents could drop off their surveys when they paid rent. At the end of the meeting, she asked for a show of hands "to approve or disapprove the survey form and conduct." HOA Board members, who "did not believe [they] were formally voting [their] approval on anything that mattered," approved the survey in a 6-1 vote.[6]

As Forbath was collecting the sample surveys, McMahan asked if she could keep hers. Forbath said no, expressing concern "about having a 'draft' floating around the [P]ark," but promised to return it once she revised the disclaimer font size. Later that week Forbath sent McMahan her sample copy along with the revised version. In the accompanying letter, Forbath stated that she was "pleased that we had the opportunity to review and discuss the proposed resident survey, and that the [HOA] Board was able to approve it at that time."

---

[6] McMahan was the lone dissenter.

Three days later, the survey was distributed to residents. Near the end of the two-week completion period, concerned Park residents held an informational meeting at which Forbath agreed to extend the survey deadline by a week. At the conclusion of the survey, the results were tabulated by a paralegal assistant to Mesa Dunes' counsel. Of the 168 households that submitted a survey, 27 percent expressed unqualified support for conversion, 23 percent supported conversion but would need financial assistance to purchase their units, 9 percent supported conversion but thought they would continue renting, 21 percent did not support conversion, and 20 percent declined to respond.

Mesa Dunes submitted its conversion application, including the results of the survey it conducted, to the Department. Five members of the HOA Board and the HOA Board's counsel submitted letters to the Department asserting that the Board had not agreed to the survey of resident support required by section 66427.5.

The Department informed Mesa Dunes by letter that its application was incomplete because it "contain[ed] insufficient evidence to show that the resident support survey was conducted in accordance with an agreement between the applicant and the [HOA]." Mesa Dunes appealed to the Board of Supervisors, which unanimously affirmed the Department's decision. The Board of Supervisors found that (1) "the HOA Board did not approve an agreement with the [P]ark owner regarding the survey, as required by Section 66427.5(d)"; (2) "[n]either the meeting nor the vote was conducted in accordance with the Mesa Dunes HOA bylaws . . . or with applicable provisions of the California Corporations Code"; and (3) "To make the application complete, the applicant must submit verifiable evidence, such as a written agreement, showing that the HOA Board has approved a survey of support." The trial court denied Mesa Dunes' subsequent petition for writ of administrative mandate. (Code Civ. Proc., § 1094.5.)

DISCUSSION

*Determination That the Conversion Application Was Incomplete*

A government agency's decision regarding a subdivision map application, being adjudicative in nature (*Horn v. County of Ventura* (1979) 24 Cal.3d 605, 614), is subject to review in the trial court by writ of administrative mandate. (*Jefferson Street*

*Ventures, LLC v. City of Indio* (2015) 236 Cal.App.4th 1175, 1196.) The trial court's inquiry extends to "whether the [agency] has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion." (Code Civ. Proc., § 1094.5, subd. (b).) "Abuse of discretion is established if the [agency] has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (*Ibid.*)

Because this case does not involve a fundamental vested right (*Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 510 fn. 1), we focus on "the agency's decision, rather than the trial court's decision, applying the same standard of review applicable in the trial court." (*Schafer v. City of Los Angeles* (2015) 237 Cal.App.4th 1250, 1261.) "We uphold the agency's factual findings if supported by substantial evidence, indulging in the presumption that the record supports the agency's findings of fact." (*Besaro Mobile Home Park, LLC v. City of Fremont* (2012) 204 Cal.App.4th 345, 354.) We review questions of statutory interpretation de novo. (*Chino MHC, LP v. City of Chino* (2012) 210 Cal.App.4th 1049, 1063.)

"In construing section 66427.5, our first task is to ascertain the intent of the Legislature" so that we effectuate the law's purpose. (*Donohue v. Santa Paula West Mobile Home Park* (1996) 47 Cal.App.4th 1168, 1174.) To the extent possible, we ascertain that intent from the statutory language. (*Id.*, at p. 1175.) We interpret the language in the context of the overall statutory framework, keeping in mind its policies and purposes, and attempting to read the language "so as to conform to the spirit of the enactment." (*Ibid.*)

Mesa Dunes contends that section 66427.5's plain language "requires simply that an applicant and a homeowners' association, if any, agree on how the applicant is to conduct the Survey." That is more or less correct, although nothing in the statute requires that the *applicant* conduct the survey. Rather, the applicant must "obtain" a survey of support, which must "be conducted" pursuant to an agreement with the HOA. So long as the applicant and HOA agree on the survey's content and method of

8

distribution and collection, it does not matter who—the applicant, the HOA, or a third party—conducts it.

Importantly, Mesa Dunes capitalizes "Survey" to refer to the specific "survey of resident support" that "[s]ection 66427.5, subd[ivision] (d)(2) requires" and thus to distinguish it from any other survey to which the HOA might agree. This distinction matters because it reflects that the HOA must understand it is agreeing not just to a survey that gauges residents' support for conversion, but to a specific survey with certain legal consequences, including whether the conversion application is approved.

In other words, the HOA must give its informed consent to the survey. This means the HOA must have been advised, at a minimum, that (1) the relevant local government agency will not accept the conversion application until the park owner conducts a survey of resident support for the conversion; (2) for the survey to be valid, the park owner and the HOA must reach an agreement on the survey's content and method of distribution and collection; (3) the agency may consider the survey results, including whether there is majority support,[7] in determining whether to approve the conversion; and (4) if the HOA has questions about its rights regarding the survey or the conversion process, it should consult independent legal counsel. If the HOA requests to consult with legal counsel, it should be given a reasonable time to do so.

Mesa Dunes argues that "[t]he existence of mutual assent is determined by objective criteria, not by one party's subjective intent." (*Marin Storage & Trucking, Inc. v. Benco Contracting and Engineering, Inc.* (2001) 89 Cal.App.4th 1042, 1050.) But as it acknowledges, a party's undisclosed intentions are immaterial only "in the absence of mistake, fraud, etc." (*Brant v. California Dairies, Inc.* (1935) 4 Cal.2d 128, 133.) Where "'"the fraud goes to the inception or execution of the agreement, so that the promisor is deceived as to the nature of his act, and actually does not know what he is [voting on], or does not intend to enter into a contract at all, mutual assent is lacking, and [the contract]

_____

[7] Mesa Dunes attempted to conduct the survey of resident support prior to the 2014 amendment to section 66427.5. Therefore, it was not required to inform the HOA that a lack of majority resident support could be considered.

is *void*."'" (*Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 415.) That is what transpired here.

Forbath, a paralegal (accompanied by Mesa Dunes' counsel Richard Close), presented conversion as a fait accompli and the survey as a mere "formality" she was "required by law to set . . . up and give . . . to people in [the] [P]ark," suggesting that there was little the HOA Board could do about it. She told the HOA Board, falsely, that the survey "did not mean anything" and that the County "did not have a real say in the conversion." No one on the HOA Board was familiar with the conversion process or the survey of support required by section 66427.5. When the HOA Board asked for an opportunity to consult with an attorney, Forbath told them there was no time because the survey needed to be approved right away. Given the HOA Board's longstanding relationship with Mesa Dunes and Forbath's refusal to give them time to seek independent legal advice, it was reasonable for the HOA Board to rely on her misrepresentation that the survey was meaningless and that they had no input into the conversion application's approval.

Mesa Dunes complains that "nothing in [s]ection 66427.5 requires that [it] advise or act as an advocate for the [HOA]." Yet Forbath *was* providing legal advice, and bad advice at that. Although the survey of support is not tantamount to "giv[ing] the residents' expression of disapproval veto power over the conversion" (*218 Properties*, *supra*, 226 Cal.App.4th at p. 195), strong resident opposition is an important factor in the agency's decision whether to approve or deny the conversion application. (See *Chino MHC, LP v. City of Chino*, *supra*, 210 Cal.App.4th at p. 1075 ["Section 66427.5 simply leaves no room for opponents of the conversion to show that a conversion is a sham, *other than* by way of the survey. Presumably that is why it requires that the survey 'be conducted in accordance with an agreement between the subdivider and a resident [HOA], if any, that is independent of the subdivider' "].) If the HOA is being advised by the park owner's counsel or their paralegal, it is not "independent" as the statute requires.

Mesa Dunes is correct that section 66427.5 does not expressly require the survey agreement to be in writing or approved in conformance with the HOA Board's

10

bylaws.[8]  The HOA Board's failure to follow such formalities here, however, is evidence that it did not appreciate the significance of the decision it was being asked to make.

Then there is the survey itself.  In ways subtle and not so subtle, it exudes a pro-conversion bias.  For example, the survey touts conversion as providing a "choice" whether to buy or continue renting.  It implies that nothing will change for those who continue renting.  The accompanying letter guarantees that "no one will be evicted."  Yet neither the survey nor the letter discloses that rents could rise substantially when rent control ends for all but lower income residents.

Three out of the five survey options express support for conversion.  For residents who want to continue renting, the survey informs them that "[y]ou can support [conversion] without a personal desire to purchase your lot."  One of the survey options corresponds to that sentiment:  "I support [conversion], but at this time I believe that I would remain and rent."  Only one option expresses opposition ("I do not support [conversion]") and is the only option asking the resident to explain his or her choice.

The remaining option, "I decline to respond at this time," could be viewed as supporting the application given that courts have ignored responses other than unequivocal opposition when determining whether a proposed conversion is a sham. (See *Chino MHC, LP v. City of Chino*, *supra*, 210 Cal.App.4th at p. 1074 [excluding survey responses that expressed no opinion and treating the low overall response rate as "affirmative evidence that the conversion was *not* a sham"].)  Here, the accompanying letter encourages such a choice by stating, "We understand that you do not currently have enough information to make a final decision."  The survey instructs residents, "If there are sections . . . for which you do not have information or do not wish to answer, simply skip those questions."

Mesa Dunes argues that the HOA Board subsequently assented to the survey by participating in it.  No one disputes that the HOA Board agreed to let Mesa

---

[8] We need not address the Board of Supervisor's alternate finding that the survey agreement was invalid because it was reached at a meeting held in violation of the HOA Board's bylaws.

Dunes conduct a survey—the issue is whether it understood the survey's significance. Because substantial evidence shows that it did not, there was no agreement to conduct the section 66427.5 survey of resident support, and as the Board of Supervisors so found. The HOA Board's acquiescence in the inconsequential survey it believed Mesa Dunes to be conducting is irrelevant. Nor do principles of equitable estoppel apply. "'[I]t is axiomatic that one who seeks equity must be willing to do equity. [Citation.]'" (*Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163, 180.)

Ensuring that the HOA understands what it is agreeing to is not a burdensome requirement. If the HOA, once fully informed of the survey's significance, negotiates its terms in bad faith or unreasonably withholds its consent, "the statute must be construed to excuse the requirement of an agreement." (*Chino MHC, LP v. City of Chino*, *supra*, 210 Cal.App.4th at p. 1079.) Without construing the statute to require that the HOA understand the agreement, however, the statutory survey of resident support would be meaningless. Any mobilehome park owner wishing to pursue a sham conversion could simply do what substantial evidence shows Mesa Dunes did here: mislead the HOA about the nature and consequences of the survey and then, before residents realized what was going on, capitalize on the information asymmetry by pushing through a survey that was heavily biased in favor of conversion.[9]

Substantial evidence supports the Board of Supervisors' finding that Mesa Dunes' conversion application was incomplete because the survey of resident support was invalid. Therefore, the trial court correctly denied the petition of writ of administrative mandate. Mesa Dunes' remedy is to reach an agreement with the HOA Board on a section 66427.5 survey of resident support whose consequences are not misrepresented. Then, and only then, it may go back to the residents with the survey.

*Augmentation of the Record*

Mesa Dunes contends that the trial court erred by denying its motion to "correct" the administrative record by augmenting it with certain email and letter

---

[9] We do not mean to imply that Mesa Dunes is pursuing a sham conversion. Without a valid survey of resident support, it is impossible to make such a determination.

correspondence. "We review that ruling for abuse of discretion. [Citation.] A court may exercise its discretion to augment an administrative record if the evidence is relevant and if it was either improperly excluded during the administrative process or it could not, in the exercise of reasonable diligence, have been presented before the administrative decision was made." (*Evans v. City of San Jose* (2005) 128 Cal.App.4th 1123, 1144.)

The evidence Mesa Dunes sought to include is (1) several email exchanges between County Planner Ted Bench and Marie Pounders, the area representative of Golden State Mobilehome Owners League; (2) an email exchange between Bench and McMahan; and (3) a letter from the Board of Supervisors to Mesa Dunes acknowledging receipt of its appeal and informing Mesa Dunes that a public hearing would be scheduled. This evidence was mostly irrelevant and, where it was relevant, not supportive of Mesa Dunes' position.

In one email, McMahan told Bench that the HOA Board "did not . . . have any input in [the survey]" and that she "wish[ed] [they] had understood that [they] could have made changes to the survey itself." Bench's response, sent the day the survey was distributed, informed her about relevant state law, including section 66427.5. Later that day Bench emailed Pounders that "McMahan recently e-mailed . . . that the developer's agent has not allowed the HOA to have any input into the survey—except to show the survey form to them. I let her know about [section 66427.5]" and its provision requiring the subdivider and HOA to agree on how to conduct the survey of resident support. This evidence supports the Board of Supervisors' finding that the HOA Board was uninformed when it consented to the survey.

Mesa Dunes misrepresents the contents of one email, claiming that Pounders "advised HOA Board President McMahan about Conversions on the morning of June 17th, *a full day before the HOA Board met with Ms. Forbath*." In fact, on the *evening* of June 17th, Pounders "request[ed] that the HOA agree to meet with [her] *at their earliest convenience* [italics added]" so that she could "give them a 'crash' course on condo conversion." At that meeting, she was "*going to* recommend they bring Will Constantine [an anti-conversion attorney] on board NOW! [italics added]" Pounders did

13

not meet with the HOA Board until June 22, 2013, four days after it met with Forbath about the survey. Pounders did tell McMahan before the HOA Board's meeting with Forbath that a bill (the 2014 amendment to section 66427.5) was "working its way through the Assembly" and that "the park owners['] attempt to condoize WILL be definitely affected if [it] passes." That, however, was not advice about conversions and did not provide McMahan, let alone the HOA Board, with enough information about the survey of resident support to understand the agreement Forbath was pressuring them to make the next morning.

The trial court correctly concluded that the emails "do not advance Mesa Dunes' position" and are "not relevant." It properly exercised its discretion in excluding them.

*Judicial Notice*

Mesa Dunes' final contention is that the trial court should have taken judicial notice that McMahan was the treasurer of County Supervisor Adam Hill's reelection campaigns. This is not so much a legal argument as an ad hominem attack. Mesa Dunes does not claim as a basis for mandamus relief that the Board's decision was unduly influenced by McMahan and Hill's relationship. The trial court did not err by declining to take judicial notice of irrelevant information and we likewise deny Mesa Dunes' request for judicial notice. (*Hayward Area Planning Assn. v. City of Hayward* (2005) 128 Cal.App.4th 176, 182.)

DISPOSITION

The judgment is affirmed. Costs on appeal to respondents.

<u>NOT TO BE PUBLISHED.</u>


PERREN, J.

We concur:

GILBERT, P. J.

YEGAN, J.

14

Barry T. LaBarbera, Judge

Superior Court County of San Luis Obispo

_____


Gilchrist & Rutter, Richard H. Close, Thomas W. Casparian, Yen N. Hope for Plaintiff and Appellant.

Rita L. Neal, County Counsel, Whitney G. McDonald, Deputy County Counsel, for Defendants and Respondents.

Law Office of William J. Constantine, William J. Constantine for Mesa Dunes Homeowners' Association as Amicus Curiae on behalf of Defendants and Respondents.